UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ZOEY METZNER, DOMINIC GRAVINO, | : | |
| DAVE BRUNEAU, and RICHARD HOTTER, | : | |
| individually and on behalf of all others | : | |
| similarly situated, | : | CIVIL NO. 3:20-cv-00784-KAD |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| QUINNIPIAC UNIVERSITY, | : | OCTOBER 5, 2020 |
| | : | |
| | : | |
| Defendant. | : | |

**THE DEFENDANT QUINNIPIAC UNIVERSITY'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS THE FIRST
<u>AMENDED CLASS ACTION COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES .................................. **ERROR! BOOKMARK NOT DEFINED.**ii

I.     INTRODUCTION ........................................................................................ 1

II.    BACKGROUND INFORMATION .......................................................... 4

      A.    The Parties .................................................................................... 4

      B.    Quinnipiac's Closure of Campus and Transition to Online Learning Due to the COVID-19 Pandemic ............................................................... 5

      C.    The Plaintiffs' Claims ................................................................... 9

III.   LEGAL ARGUMENT ............................................................................ 10

      A.    Legal Standard ............................................................................ 10

      B.    The Complaint Should Be Dismissed Because All of the Plaintiffs' Claims Are Non-Actionable Educational Malpractice Claims ........................................ 10

      C.    The Plaintiffs Have Failed to State Any Claim for Breach of Contract ............. 17

            1.    The Plaintiffs Have Not Alleged That the Educational Program Offered by Quinnipiac Failed in Some Fundamental Respect................. 19

            2.    The Plaintiffs Have Not Alleged That Quinnipiac Breached a Specific Contractual Promise ....................................................... 20

            3.    The Plaintiffs Have Not Alleged That Quinnipiac Acted in Bad Faith ............................................................................................... 27

      D.    The Plaintiffs Have Failed to State a Claim for Unjust Enrichment................... 28

      E.    The Plaintiffs Have Failed to State a Claim for Conversion ............................. 32

IV.   CONCLUSION...................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ambrose v. New Eng. Ass'n of Schs. and Colls., Inc.*,
 252 F.3d 488 (1st Cir. 2001) ...................................................................14

*Anthes v. New York Univ.*,
 No. 17cv2511 (ALC), 2018 WL 1737540 (S.D.N.Y. Mar. 12, 2018), *aff'd sub
 nom.*, *Anthes v. Nelson*, 763 Fed. App'x 57 (2d Cir. 2019) .....................................20

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ......................................................................10, 32, 34

*Aztec Energy Partners, Inc. v. Sensor Switch, Inc.*,
 531 F. Supp. 2d 226 (D. Conn. 2007) ...........................................................33

*Barneby v. New Eng. Sch. of Montessori, LLC*,
 No. AANCV156019330S, 2016 WL 3768928 (Conn. Super. Ct. June 9, 2016) ...................12

*Belford Trucking Co. v. Zagar*,
 243 So.2d 646 (Fla. App. 1970) .................................................................33

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ...........................................................................10

*Bell v. Bd. of Educ. of City of W. Haven*,
 55 Conn. App. 400 (1999) ......................................................................13

*Brodsky v. Mead Sch. Sch. For Human Dev.*,
 No. DNX05CV970156788S, 1999 WL 391580 (Conn. Super. Ct. June 4,
 1999) ........................................................................................28

*Burns v. Quinnipiac Univ.*,
 120 Conn. App. 311 (2010) ..................................................................18, 21

*Caveliere v. Duff's Bus. Inst.*,
 413 Pa. Super. 357, 605 A.2d 397 (1992) ........................................................13

*CenCor, Inc. v. Tolman*,
 868 P.2d 396 (Colo. 1994) (*en banc*) .........................................................13, 20

*Chambers v. Time Warner, Inc.*,
 282 F.3d 147 (2d Cir. 2002) .....................................................................4

*Cherry Hill Constr. Inc. v. E.F.S. Mach., LLC*,
 No. CV156053196S, 2015 WL 3975711 (Conn. Super. Ct. June 3, 2015) ..........................33

*Chong v. Northeastern Univ.*,
   No. 20-10844-RGS, 2020 WL 5847626 (D. Mass. Oct. 1, 2020) ........................21, 22, 23, 29

*Coster v. Duquette*,
   119 Conn. App. 827 (2010) ......................................................................................................33

*Courtenay Comms. Corp. v. Hall*,
   334 F.3d 210 (2d Cir. 2003).......................................................................................................4

*Cullen v. Univ. of Bridgeport*,
   No. CV020396010, 2003 WL 23112678 (Conn. Super. Ct. Dec. 10, 2003) ....................14, 19

*Deming v. Nationwide Mut. Ins. Co.*,
   275 Conn. 745 (2006) .........................................................................................................33, 34

*Doe v. Vanderbilt Univ.*,
   No. 3:18-cv-00569, 2019 WL 4748310 (M.D. Tenn. Sept. 30, 2019) ...................................14

*Doe v. Yale Univ.*,
   252 Conn. 641 (2000) ..............................................................................................................13

*Donohue v. Copiague Union Free Sch. Dist.*,
   47 N.Y.2d 440, 391 N.E.2d 1352 (1979).........................................................................12, 13

*Faigel v. Fairfield Univ.*,
   75 Conn. App. 37 (2003) .........................................................................................................20

*Feng v. Dart Hill Realty, Inc.*,
   26 Conn. App. 380 (1992) .......................................................................................................29

*Finn v. Barney*,
   471 F. App'x 30 (2d Cir. 2012) .................................................................................................5

*Fletcher v. Mead Sch. for Human Dev.*,
   No. X05CV 960152138S, 1999 WL 391583 (Conn. Super. Ct. June 4, 1999)......................28

*Gally v. Columbia Univ.*,
   22 F. Supp. 2d 199 (S.D.N.Y. 1998)........................................................................13, 20, 25

*Gillis v. Principia Corp.*
   111 F. Supp. 3d 978 (E.D. Mo. 2015), aff'd, 832 F.3d 865 (8th Cir. 2016)..........................21

*Goldstein v. Pataki*,
   516 F.3d 50 (2d Cir. 2008)........................................................................................................6

*Grutter v. Bollinger*,
   539 U.S. 306 (2003)............................................................................................................2, 16

*Gupta v. New Britain Gen. Hosp.*,
  239 Conn. 574 (1996) ................................................................................. *passim*

*Harris v. Shea*,
  No. CV010085838S, 2002 WL 31939113 (Conn. Super. Ct. Dec. 24, 2002).........................29

*Hartford Whaler's Hockey Club v. Uniroyal Goodrich Tire Co.*,
  231 Conn. 276 (1994) .................................................................................29

*Hesse v. Godiva Chocolatier, Inc.*,
  No. 19-CV-972 (AJN), 2020 WL 2793014 (S.D.N.Y. May 29, 2020) ...................................5

*HLO Land Ownership A. Ltd. v. Hartford*,
  248 Conn. 350 (1999) .................................................................................30

*Hope Acad. v. Friel*,
  No. CV030081183S, 2004 WL 1888909 (Conn. Super. Ct. July 22, 2004).........................20

*Issler v. Issler*,
  250 Conn. 226 (1999) .................................................................................18

*Itek Corp. v. First Nat'l Bank of Boston*,
  566 F. Supp. 1210 (D. Mass. 1983) ...............................................................26

*Jacobs v. Ethel Walker Sch. Inc.*,
  No. CV020515279S, 2003 WL 22390051 (Conn. Super. Ct. Sept. 30, 2003) ......................12

*Jones v. Vassar College*,
  299 N.Y.S.2d 283 (Sup. Ct. 1969).................................................................14

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941)...................................................................................11

*Kloth-Zanard v. Amridge Univ.*,
  No. 3:09CV606 JBA, 2012 WL 2397161 (D. Conn. June 25, 2012) ..............................20, 27

*Knelman v. Middlebury Coll.*,
  898 F. Supp. 2d 697 (D. Vt. 2012)..............................................................21, 25

*Leonard F. v. Israel Discount Bank of N.Y.*,
  199 F.3d 99 (2d Cir. 1999)............................................................................4

*Liberty Mut. Ins. Co. v. Harco Nat'l Ins. Co.*,
  990 F. Supp. 2d 194 (D. Conn. 2013).............................................................11

*Liberty Synergistics Inc. v. Microflo Ltd.*,
  718 F.3d 138 (2d Cir. 2013)...........................................................................11

*Macomber v. Travelers Prop. & Cas. Corp.*,
   261 Conn. 620 (2002) ................................................................................33, 34

*Madej v. Yale Univ.*,
   No. 3:20-cv-133 (JCH), 2020 WL 1614230 (D. Conn. Mar. 31, 2020) .....................12, 16, 29

*McNeil v. Yale Univ.*,
   436 F. Supp. 3d 489 (D. Conn. 2020)................................................................18, 19, 21, 25

*Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*,
   311 Conn. 282 (2014) ..........................................................................................17

*MM Global Servs., Inc. v. Dow Chem. Co.*,
   283 F. Supp. 2d 689 (D. Conn. 2003)...................................................................11

*Molaver v. Thomas*,
   125 Conn. App. 88 (2010) ...................................................................................17, 20

*Montanez v. D&D Auto, LLC*,
   No. 3:15-cv-397, 2016 WL 1254199 (D. Conn. Mar. 29, 2016) ...........................10

*Munich Reins. Co. v. First Reins. Co. of Hartford*,
   6 F.2d 742 (2d Cir. 1925)....................................................................................6

*O'Connor v. O'Connor*,
   201 Conn. 632 (1986) ..........................................................................................11

*Paladino v. Adelphi Univ.*,
   89 A.D.2d 85, 454 N.Y.S.2d 868 (1982) .............................................................12

*Paynter v. New York Univ.*,
   319 N.Y.S.2d 893 (App. Div. 1st Dept. 1971) (*per curiam*) ...........................14, 15, 16

*Pelizari v. Pisciotta*,
   No. TTDCV085002792S, 2009 WL 1577821 (Conn. Super. Ct. May 8, 2009) ...................34

*Perretti v. Montana*,
   464 F. Supp. 784 (D. Mont. 1979), rev'd on other grounds, 661 F.2d 756 (9th
   Cir. 1981) ............................................................................................................21

*Regents v. Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978)..............................................................................................2, 16, 17

*Reichhold Chems., Inc. v. Hartford Acc. and Indem. Co.*,
   243 Conn. 401 (1997) ..........................................................................................11

*Reynolds v. Sterling Coll., Inc.*,
   750 A.2d 1020 (Vt. 2000)....................................................................................21

*Roe v. Loyola Univ. New Orleans*,
No. 07-1828, 2007 WL 4219174 (E.D. La. Nov. 26, 2007) .............................................31, 32

*Rosato v. Mascardo*,
82 Conn. App. 396 (2004) ..................................................................................................17

*Ross v. Crieghton Univ.*,
957 F.2d 410 (7th Cir. 1992) ..............................................................................................12

*Ruggiero v. Yale Univ.*,
No. 3:06-cv-1165 (WWE), 2007 WL 2684631 (D. Conn. Sept. 10, 2007)...........................16

*Sicaras v. Hartford*,
44 Conn. App. 771 (1997) ..................................................................................................30

*Smith v. Local 819 I.B.T. Pension Plan*,
291 F.3d 236 (2d Cir. 2002)................................................................................................10

*Soderbloom v. Yale Univ.*,
No. CV-91-0324553S, 1992 WL 24448 (Conn. Super. Ct. Feb. 3, 1992).............13, 14, 21, 26

*Soueidan v. St. Louis Univ.*,
926 F.3d 1029 (8th Cir. 2019) ............................................................................................21

*Soyak v. Town of New Fairfield, Ct.*,
No. 3:07 CV 893 (CFD), 2008 WL 3992713 (D. Conn. Aug. 21, 2008) ................................4

*Squeri v. Mount Ida College*,
954 F.3d 56 (1st Cir. 2020)................................................................................................23

*Stern & Co. v. Int'l Harvester Co.*,
148 Conn. 527 (1961) .........................................................................................................30

*Tankoos v. Mead Sch. for Human Dev.*,
No. X05CV950145853S, 1999 WL 391350 (Conn. Super. Ct. June 4, 1999).................19, 28

*Therrien v. Safeguard Mfg. Co.*,
180 Conn. 91 (1980) ...........................................................................................................17

*Valente v. Univ. of Dayton*,
438 Fed. App'x 381 (6th Cir. 2011) ....................................................................................14

*Vertex, Inc. v. Waterbury*,
278 Conn. 557 (2006) .........................................................................................................29

*Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher-Price, Inc.*,
406 F. Supp. 2d 175 (D. Conn. 2005)..................................................................................11

*Vogel v. Maimonides Acad. of W. Conn., Inc.,*
    58 Conn. App. 624 (2000) ...........................................................................12, 13, 20

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC,*
    127 F. Supp. 3d 156 (S.D.N.Y. 2015)....................................................................5, 6

**Other Authorities**

Executive Order No. 7C...........................................................................................7

Executive Order No. 7H ..........................................................................................8

Fed. R. Civ. P. 12(c) ...............................................................................................4

Federal Rule of Civil Procedure 12(b)(6) ........................................................1, 4, 10

The Defendant Quinnipiac University ("Quinnipiac"), by and through its counsel, respectfully submits this Memorandum of Law in support of its Motion to Dismiss the First Amended Class Action Complaint (Dkt. 25) ("Amended Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.   INTRODUCTION

When the COVID-19 pandemic emerged, it caused immediate and seismic changes to nearly every aspect of daily life across the globe. As of the filing of this motion, the virus has infected over 7.4 million people in the United States and caused over 209,000 deaths.[1] In Connecticut, 58,297 people have been infected and 4,513 people have died from COVID-19.[2]

In response to the threats posed by this unprecedented public health crisis, Quinnipiac made the difficult but well-considered decision in March 2020 to close its campus and transition its in-person classes to online instruction for the remainder of the Spring 2020 semester, in order to protect the health and safety of its students, faculty, and staff. Quinnipiac invested thousands of hours of faculty and staff time and considerable resources to ensure that its students could safely and successfully complete the Spring 2020 semester and receive the academic credits and degrees that they expected.

This putative class action is one of scores that have been filed against institutions of higher education across the country seeking a refund of tuition and fees for the time that in-person classes were conducted online because of the pandemic. Although the Plaintiffs concede that the reasons for closing campus and transitioning to online classes were justified, they nonetheless claim that they received less than what they bargained for and are entitled to a

---

[1]  *See* The New York Times, Coronavirus in the U.S.: Latest Map and Case Count (last visited October 5, 2020), available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[2]  *See* Connecticut COVID-19 Data Tracker (last visited August 24, 2020), available at https://portal.ct.gov/Coronavirus/COVID-19-Data-Tracker.

prorated refund of tuition, fees, and/or payments made for room and board.[3] The Plaintiffs' claims are without merit.

*First*, all of the Plaintiffs' claims—for breach of contract, breach of implied contract, unjust enrichment, and conversion—hinge on the allegation that the Plaintiffs received an education that was worth less than what they paid because of the transition to online learning. This claim for educational malpractice is precluded under well-established law, which bars judicial interference in disputes over educational decisions or the quality or effectiveness of an institution's instruction. These precedents are grounded in the principle that a university has the academic freedom "to make its own judgment as to education." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003) (citations omitted). Indeed, the United States Supreme Court has recognized that the "four essential freedoms of a university" include the right "to determine for itself on academic grounds who may teach, what may be taught, ***how it shall be taught***, and who may be admitted to study." *Regents v. Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (emphasis added) (quotation omitted). An analysis by this Court or a jury of any of the Plaintiffs' claims would constitute an impermissible intrusion on Quinnipiac's educational autonomy to determine, among other things, how its students are best taught. This type of analysis is barred by the educational malpractice doctrine. On that basis alone, this motion should be granted.

*Second*, the Plaintiffs have failed to state a claim for breach of contract because, despite an amendment of the Complaint, they have not identified a specific identifiable promise to either exclusively provide in-person on-campus instruction (even during a pandemic) or to provide a prorated refund of tuition and fees in the event an instructional format change becomes necessary. None of the provisions of Quinnipiac's 2019-2020 Official Bulletin ("Bulletin") that

---

[3] The Plaintiffs acknowledge that Quinnipiac provided credits for housing and dining to returning students and refunds for departing students for the time that campus was closed and do not allege that such credits or refunds were somehow inadequate. (Am. Compl. ¶¶ 80-81.)

the Plaintiffs cite in the Amended Complaint is a specific promise to provide in-person on-campus instruction at all times. Nor is there any provision in the Bulletin that governs the manner or format in which Quinnipiac was to deliver education or services to its students. The Plaintiffs cite only broad aspirational language in the Bulletin regarding the residential on-campus experience. In contrast, specific provisions of the Bulletin make clear that tuition refunds are only available in certain limited situations—none of which apply here. The Bulletin does ***not*** provide that refunds are available if the means of instruction changes or if a student is dissatisfied with how a class was taught. The Plaintiffs have also failed to state a breach of contract claim because they have not adequately alleged that the educational program provided by Quinnipiac was defective in a fundamental respect that is objectively measurable, or that Quinnipiac acted in bad faith by closing its campus and transitioning to online learning in response to the pandemic (to the contrary, the Plaintiffs expressly acknowledge that this decision was justified).

*Third*, the Plaintiffs' unjust enrichment claim cannot be sustained because there is an enforceable contract that regulates the relations of the parties, because they have not alleged the existence of an illusory contract, and because there are no allegations to support the claim that Quinnipiac unjustly retained non-gratuitous benefits conferred by the Plaintiffs.

*Finally*, the Plaintiffs have failed to state a claim for conversion because their assertion that they are entitled to a refund of tuition and fees sounds in contract, not the tort of conversion. The Plaintiffs' conversion claim is also unsupportable because they have not alleged sufficient facts to establish that the money they allege that they are owed belonged to them at all times, and because they have not specifically identified the amount of money that has been wrongfully withheld.

For these reasons and the reasons discussed more fully below, this Motion to Dismiss should be granted.

## II.   BACKGROUND INFORMATION

### A.   The Parties

The Plaintiff Zoey Metzner ("Plaintiff Metzner") is a resident of Massachusetts. (Am. Compl. ¶ 10.)[4] Plaintiff Metzner was the sole named plaintiff in the original Complaint, and three additional plaintiffs joined in the Amended Complaint. The Plaintiff Dominic Gravino ("Plaintiff Gravino") is a resident of California. (*Id.* ¶ 11.) The Plaintiff Dave Bruneau ("Plaintiff Bruneau") is a resident of Connecticut and the parent of two Quinnipiac undergraduate students. (*Id.* ¶ 12.) The Plaintiff Richard Hotter ("Plaintiff Hotter") is a resident of New Jersey and the parent of a Quinnipiac undergraduate student. (*Id.* ¶ 13.) Plaintiff Metzner and Plaintiff Gravino were enrolled at Quinnipiac as full-time students during the 2019-2020 academic year and Plaintiff Bruneau and Plaintiff Hotter had children who were enrolled at Quinnipiac as full-time students during the 2019-2020 academic year. (*Id.* ¶¶ 10-13.)

The Plaintiffs seek to represent a class defined as "All people paying Defendant, in whole or in part, personally and/or on behalf of others, for tuition, fees, and/or room and board for in-person instruction and use of campus facilities, but who were denied use of and/or access to in-person instruction and/or campus facilities by Defendant for the Spring 2020 academic term or any subsequent term." (*Id.* ¶ 83.)

Quinnipiac is a private coeducational university with its principal place of business in

---

[4] The Complaint's allegations are accepted as true solely for the purposes of this Motion. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). "In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken," such as the webpages referenced in the Amended Complaint. *See Soyak v. Town of New Fairfield, Ct.*, No. 3:07 CV 893 (CFD), 2008 WL 3992713, at *1 (D. Conn. Aug. 21, 2008) (citing Fed. R. Civ. P. 12(c); *Courtenay Comms. Corp. v. Hall*, 334 F.3d 210, 213 (2d Cir. 2003); *Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999)).

Connecticut. (*Id.* ¶ 21.) Quinnipiac offers undergraduate, graduate, and professional degrees to approximately 10,000 students. (*Id.* ¶ 22.)

### B.     Quinnipiac's Closure of Campus and Transition to Online Learning Due to the COVID-19 Pandemic

COVID-19 was first identified in Wuhan, China in December 2019. (*Id.* ¶ 53.) On January 21, 2020, Quinnipiac's Spring 2020 semester began for undergraduate and graduate programs, with the exception of law and medicine programs which had started two weeks earlier, on January 6, 2020. (Dkt. 25-3, at 14 of 749.) On that same date, officials in the United States confirmed the first known domestic infections of COVID-19. (Am. Compl. ¶ 54.) On January 28, 2020, Quinnipiac issued a university-wide communication advising that the university was closely monitoring the latest information about the coronavirus and was "being proactive and taking measures to ensure the health and well-being of our students, faculty and staff." (*See* https://www.qu.edu/today/coronavirus.html.)[5]  On January 30, 2020, the World Health Organization declared the COVID-19 outbreak a Public Health Emergency of International Concern and subsequently declared it a pandemic on March 11, 2020. (Am. Compl. ¶¶ 55-56.) On March 13, 2020, President Donald J. Trump issued a Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak. (*See* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.)

---

[5] In considering a motion to dismiss, the Court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination. *Hesse v. Godiva Chocolatier, Inc.*, No. 19-CV-972 (AJN), 2020 WL 2793014, at *3 (S.D.N.Y. May 29, 2020) (citing *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015); *see also Finn v. Barney*, 471 F. App'x 30, 32 (2d Cir. 2012) (affirming district court taking judicial notice of webpages and media reports)). The Amended Complaint cites to various pages of Quinnipiac's website, and so Quinnipiac relies on it in this Memorandum. (*See, e.g.*, Am. Compl. ¶ 26 n.2.)

On March 2, 2020, prior to its Spring Break,[6] Quinnipiac issued a university-wide communication advising, among other things, that its Coronavirus Task Force was focused on ensuring readiness for any needs relating to COVID-19 and that it would "continue to meet and communicate with state and federal health officials over the spring break." (*See* https://www.qu.edu/today/coronavirus-update-03022020.html.) On March 9, 2020, Quinnipiac sent a message to faculty about preparing to move courses online. (Am. Compl. ¶ 58; *see also* https://www.qu.edu/today/coronavirus-update-03092020.html.) This message noted, among other things, that the "university's deliberations and actions thus far have been guided by three overarching priorities: the health and safety of our students, faculty, and staff; support of academic completion; and adherence to CDC guidelines." (*See* https://www.qu.edu/today/coronavirus-update-03092020.html).)

On March 10, 2020, in response to the COVID-19 outbreak, Connecticut Governor Ned Lamont declared a public health emergency and civil preparedness emergency throughout the State of Connecticut, authorizing and directing the Commissioner of Public Health to delegate the powers regarding isolation or quarantine to municipal and district directors of public health. (*See* https://portal.ct.gov/-/media/Office-of-the-Governor/News/20200310-declaration-of-civil-preparedness-and-public-health-emergency.pdf.)[7] He further ordered municipalities, local health officials, and local education officials "to follow previously issued guidance and apply relevant principles of risk management to decisions about whether to cancel, modify, or postpone large gatherings, public events, or travel." (*Id.*) Governor Lamont advised that orders regarding

---

[6] Quinnipiac's Spring Break for all undergraduate, graduate, law, and first year medical students occurred during the week of March 8, 2020. (Dkt. 25-3, at 14 of 749.)

[7] The Court may also take judicial notice of government records such as Governor Lamont's executive orders. *Goldstein v. Pataki*, 516 F.3d 50, 60 n.7 (2d Cir. 2008); *Munich Reins. Co. v. First Reins. Co. of Hartford*, 6 F.2d 742, 746 (2d Cir. 1925); *Wells Fargo*, 127 F. Supp. 3d at 166.

additional measures to protect public health and safety would follow. (*Id.*)

Also on March 10, 2020, Quinnipiac announced that online delivery of classes would begin on Wednesday, March 18, 2020 and that students would not return to campus until Sunday, March 22, 2020. (Am. Compl. ¶ 59.) This announcement stated, in part: "Eliminating in-person classroom instruction is an important step to minimize potential pathways for community spread of COVID-19 within our QU community." (*See* https://www.qu.edu/today/coronavirus-community-update-03102020.html); *see also* Am. Compl. ¶ 59 n.24.)

On March 15, 2020, Governor Lamont issued Executive Order No. 7C, which, among other things, ordered that all public school classes be cancelled for all students effective from March 17 until March 31, 2020, unless extended beyond that date. (*See* https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7C.pdf.) The order further stated that "[p]rivate schools and other non-public schools are encouraged to follow the same schedule." (*Id.*)

That same day, Quinnipiac announced that students would not return to campus after the extended Spring Break and that the remainder of the semester would be delivered online. (Am. Compl. ¶ 61 and n.26.) This announcement stated, in pertinent part:

> Dear Quinnipiac Family,
>
> We're all living through an unprecedented time that continues to change on a daily—often hourly—basis. There's no doubt that our lives have been upended for a while. That's been very hard for many, including our students who come to Quinnipiac not just to learn, but to connect, compete, grow and lead. Through this time, the choices we are making place protecting the health of the entire Quinnipiac community, and supporting the continued academic work of our students, above all else.
>
> **This is why today we have come to this very difficult decision: Students will not return to campus after the extended spring break, and the remainder of**

> **the spring semester will be delivered online.** University housing will be closed for the remainder of the spring semester with the exception of certain cases that need accommodation. Taking this action now is—without a doubt—in the best interest of our students' health, the health of our faculty and staff, and our local communities. It is also consistent with the recommendations and urging of government officials all around us to safeguard communities and to try and slow the continued spread of this virus.

(*See* https://www.qu.edu/today/coronavirus-update-03152020.html) (emphasis in original); *see also* Am. Compl. ¶ 61 and n.26.) This notice further advised that Quinnipiac anticipated being able to provide some level of refund for housing and meal plans for those graduating and, for students not yet graduating, a credit would be applied against the next academic year's costs. (*See* https://www.qu.edu/today/coronavirus-update-03152020.html.) From the start of the Spring 2020 semester through March 18, 2020, which was the inception date for online learning, Quinnipiac had held seven weeks of in-person classes. (*See* Dkt. 25-3, at 14 of 749.)

On March 20, 2020, Governor Lamont issued Executive Order No. 7H, Connecticut's "Stay Safe, Stay Home" restrictions on all workplaces for non-essential businesses, which became effective on March 23, 2020. (*See* https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7H.pdf?la=en; Am. Compl. ¶ 62.) Even if Quinnipiac had not decided to close its campus and transition to online classes as of this date, it would have been required to do so by this order.

On April 22, 2020, Quinnipiac confirmed that credits and/or refunds for housing and meal plans would be provided. (Am. Compl. ¶ 80; https://www.qu.edu/today/coronavirus-update-04222020.html.) This announcement also noted that Quinnipiac was facing $40 million in costs associated with the coronavirus. (Am. Compl. ¶ 80; https://www.qu.edu/today/coronavirus-update-04222020.html.) The only fee that the Plaintiffs allege that they paid Quinnipiac is a technology fee of $720 per year. (Am. Compl. ¶ 45.)

C.      **The Plaintiffs' Claims**

On June 5, 2020, Plaintiff Metzner instituted this putative class action against Quinnipiac seeking a refund of tuition and fees during the time that Quinnipiac modified its operations because of the pandemic. (Dkt. 1.) On August 24, 2020, Quinnipiac filed its Motion to Dismiss on the grounds that all of the claims were barred by the educational malpractice doctrine and that, for other independent reasons, each of the claims for breach of contract, unjust enrichment, and conversion failed to state a claim. (Dkt. 22, 23.) Instead of opposing Quinnipiac's prior Motion to Dismiss, on September 13, 2020, the Plaintiffs filed the Amended Complaint. (Dkt. 25.)

The Amended Complaint reasserts these claims and adds a claim for breach of implied contract. (*Id.*) The Plaintiffs: (1) rely on general statements on Quinnipiac's website and in the Bulletin to assert a claim that Quinnipiac breached a still-unidentified contractual provision to always provide in-person instruction and an open campus to its students, (*id.* ¶¶ 97-103); (2) assert a breach of implied contract claim that is based on the same allegations, (*id.* ¶¶ 104-12); (3) assert an unjust enrichment claim for Quinnipiac's retention of tuition and fees that the Plaintiffs claim were paid so that they could avail themselves of in-person educational opportunities and utilize campus facilities, (*id.* ¶¶ 113-23); and (4) assert a claim for conversion based on Quinnipiac's alleged wrongful exercise of control over and/or intentional interference with the rights of the Plaintiffs by closing its campus and switching to online learning and unlawfully retaining the monies the Plaintiffs paid to Quinnipiac, (*id.* ¶¶ 124-29).

The Plaintiffs seek to recover a refund of tuition and fees for the undefined and subjective difference between the value of in-person classes and classes delivered remotely. (*Id.* ¶¶ 103, 112, 123, 128.) They also seek to recover payments made for room and board, even though the Amended Complaint acknowledges that Quinnipiac provided credits for housing and dining to

returning students and refunds for departing students for the time that campus was closed. (*Id.* ¶¶ 80, 103, 112, 123, 128; *see also* https://www.qu.edu/today/coronavirus-update-04222020.html.) The Plaintiffs do not allege how these housing/dining credits and refunds were somehow inconsistent with or insufficient under any purported contractual obligation.

## III.   LEGAL ARGUMENT

### A.   Legal Standard

A complaint will survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) only if it states "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). According to the Supreme Court, this standard requires that the complaint plead sufficient facts to enable a court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Id.* (citing *Twombly*, 550 U.S. at 556). Although "detailed factual allegations" are not required, a complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555, 557; *Montanez v. D&D Auto, LLC*, No. 3:15-cv-397, 2016 WL 1254199, at *3 (D. Conn. Mar. 29, 2016). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss" from being granted. *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002).

### B.   The Complaint Should Be Dismissed Because All of the Plaintiffs' Claims Are Non-Actionable Educational Malpractice Claims

The Amended Complaint should be dismissed because all four counts are impermissible educational malpractice claims that would require this Court to evaluate whether the quality and value of the Plaintiffs' education was diminished by the transition to online learning. In each of their claims, the Plaintiffs seek a refund of the difference between the undefined value of in-

person instruction and instruction provided online, relying not upon facts but vague and subjective conclusions. (*See, e.g.*, Am. Compl. ¶ 2 ("So while students enrolled and paid Defendant for a comprehensive academic experience, Defendant instead offers Plaintiffs and Class Members ***something far less*** . . . .") (emphasis added); *id.* ¶ 7 ("Plaintiffs bring this action because Plaintiffs and Class Members did not receive the ***full-value of the services paid*** . . . .") (emphasis added); *id.* ¶ 66 (alleging that Quinnipiac provided "only emergency and unplanned online educational experiences that are ***vastly different from what Plaintiffs and Class Members contracted and paid for***") (emphasis added); *id.* ¶ 102 ("The online classes provided by Defendant are objectively different from, and ***less valuable than***, the on-campus classes for which the parties contracted.") (emphasis added); *id.* ¶ 112 ("The online classes provided by Defendant are objectively different from, and ***less valuable than***, the on-campus classes for which the parties entered into an implied contract.") (emphasis added).) Under well-established Connecticut law, courts are not permitted to make these types of evaluations regarding the value of services provided by educational institutions.[8]

　　*Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574 (1996), is the landmark Connecticut

---

[8] Connecticut law applies in this action. When diversity is the jurisdictional basis, federal courts apply the choice of law principles of the jurisdiction in which they sit. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 151 (2d Cir. 2013). For contract claims, "Connecticut courts apply the 'most significant relationship' test to determine which law should apply, weighing factors such as '(a) the place of contracting, which is the place where occurred the last act necessary to give the contract binding effect; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.'" *Liberty Mut. Ins. Co. v. Harco Nat'l Ins. Co.*, 990 F. Supp. 2d 194, 200 (D. Conn. 2013) (quoting *MM Global Servs., Inc. v. Dow Chem. Co.*, 283 F. Supp. 2d 689, 699 (D. Conn. 2003) (citing *Reichhold Chems., Inc. v. Hartford Acc. and Indem. Co.*, 243 Conn. 401, 409-410 (1997)). Connecticut courts also apply a "most significant relationship test" for tort claims, which weighs the following factors: (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and business of the parties, and (4) the place where the relationship, if any, between the parties is centered. *O'Connor v. O'Connor*, 201 Conn. 632, 637 (1986); *Victor G. Reiling Assocs. & Design Innovation, Inc. v. Fisher-Price, Inc.*, 406 F. Supp. 2d 175, 200 (D. Conn. 2005). Here, these factors all weigh in favor of the application of Connecticut law because the place of performance of the alleged contract, the location of the subject matter of the contract, the place of business of the Defendant, the place where the conduct causing the alleged injury occurred, and the place where the relationship between the parties is centered are all in Connecticut.

Supreme Court case addressing judicial noninterference in disputes regarding the quality or value of an education, particularly with respect to breach of contract claims brought by students against universities. The plaintiff in *Gupta* was a former medical resident who had been dismissed from his residency program due to inadequate academic performance. He sued the hospital for allegedly breaching its contract by failing to provide a residency program that would reasonably and adequately train him and that was in accordance with the standards recognized for teaching hospitals. *Id.* at 590. In rejecting the plaintiff's claim, the Connecticut Supreme Court "joined the vast majority of states that have rejected educational malpractice claims . . . ." *Vogel v. Maimonides Acad. of W. Conn., Inc.*, 58 Conn. App. 624, 629 (2000).

When the gravamen of the complaint is that the institution failed to provide an effective or quality education, all of the claims asserted in the complaint are to be construed as educational malpractice claims, no matter what labels or conclusions are used in pleading the claims. *Gupta*, 239 Conn. at 591-92 (citations omitted).[9] This is because if "the essence of the complaint is that [an educational institution] breached its agreement by failing to provide an effective education, the court is . . . asked to evaluate the course of instruction [and] called upon **to review the soundness of the method of teaching that has been adopted by [that] educational institution**. . . . **This is a project that the judiciary is ill equipped to undertake**." *Id*. at 590 (emphasis added and internal quotations omitted) (quoting *Ross v. Crieghton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992), and citing *Donohue v. Copiague Union Free Sch. Dist.*, 47 N.Y.S.2d 440, 445, 391 N.E.2d

---

[9] *See also Madej v. Yale Univ.*, No. 3:20-cv-133 (JCH), 2020 WL 1614230, at *8, *16 (D. Conn. Mar. 31, 2020) (analyzing the plaintiff's breach of contract and negligence claims in the context of the educational malpractice doctrine); *Jacobs v. Ethel Walker Sch. Inc.*, No. CV020515279S, 2003 WL 22390051, at *4 (Conn. Super. Ct. Sept. 30, 2003) ("The Appellate Court in *Vogel* makes clear that a plaintiff does not have to use the words 'educational malpractice' in order for a cause of action to sound in the tort of educational malpractice."); *Barneby v. New Eng. Sch. of Montessori, LLC*, No. AANCV156019330S, 2016 WL 3768928, at *3 (Conn. Super. Ct. June 9, 2016) (construing the plaintiff's breach of contract claim for the failure to provide quality educational opportunities as a claim for educational malpractice); *accord Paladino v. Adelphi Univ.*, 89 A.D.2d 85, 89, 454 N.Y.S.2d 868 (1982) ("the soundness of [the] policy of noninterference is equally applicable when the action is . . . formulated in contract").

1352 (1979); *Caveliere v. Duff's Bus. Inst.*, 413 Pa. Super. 357, 370, 605 A.2d 397 (1992)); *see also Doe v. Yale Univ.*, 252 Conn. 641, 663 (2000) ("When the claimed result is an inadequate education, there is no viable claim because we are unwilling to recognize such a legal duty as a matter of public policy.") (citing *Gupta*, 239 Conn. at 590-95); *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206-07 (S.D.N.Y. 1998) ("Where the essence of the complaint is that the school breached its agreement by failing to provide an effective education, the complaint must be dismissed as an impermissible attempt to avoid the rule that there is no claim in New York for 'educational malpractice.'").

At its core, an educational malpractice claim "'raise[s] questions concerning the reasonableness of conduct by educational institutions in providing particular educational services to students—questions that must be answered by reference to principles of duty, standards of care, and reasonable conduct associated with the law of torts.'" *Gupta*, 239 Conn. at 590 (quoting *CenCor, Inc. v. Tolman*, 868 P.2d 396, 399 (Colo. 1994) (*en banc*)). "Because these tort principles are difficult, if not impossible, to apply in the academic environment, courts have almost universally held that claims of 'educational malpractice' are not cognizable. Among other problems for adjudication, these claims involve the judiciary in the awkward tasks of defining what constitutes a reasonable educational program and of deciding whether that standard has been breached." *Id.* at 590-91 (citation omitted).

"In entertaining such claims, moreover, courts are required 'not merely to make judgments as to the validity of broad educational policies . . . but, more importantly, to sit in review of the day-to-day implementation of these policies." *Id.* at 591 (quoting *Donohue*, 47 N.Y.2d at 445); *see also Vogel*, 58 Conn. App. at 629–30 (reciting standard); *Bell v. Bd. of Educ. of City of W. Haven*, 55 Conn. App. 400, 405–06 (1999) (same); *accord Soderbloom v. Yale*

*Univ.*, No. CV-91-0324553S, 1992 WL 24448, at *2 (Conn. Super. Ct. Feb. 3, 1992) ("Further, courts have enunciated a doctrine whereby private colleges and universities have been permitted a considerable degree of freedom, acknowledging that 'private colleges and universities are governed on the principle of academic self regulation, free from judicial restraints.'") (quoting *Jones v. Vassar College,* 299 N.Y.S.2d 283, 287 (Sup. Ct. 1969)); *Ambrose v. New Eng. Ass'n of Schs. and Colls., Inc.*, 252 F.3d 488, 499 (1st Cir. 2001) ("Courts consistently have rejected students' claims of educational malpractice against schools" in light of "the lack of satisfactory standard of care by which to evaluate educators' professional judgment and the patent undesirability of having courts attempt to assess the efficacy of the operations of academic institutions.").

Significantly, Connecticut courts have recognized that "universities must have the flexibility to make changes in furtherance of their educational responsibilities." *Soderbloom*, 1992 WL 24448, at *4; *see also Cullen v. Univ. of Bridgeport*, No. CV020396010, 2003 WL 23112678, at *4 (Conn. Super. Ct. Dec. 10, 2003) (same); *accord Doe v. Vanderbilt Univ.*, No. 3:18-cv-00569, 2019 WL 4748310, at *12 (M.D. Tenn. Sept. 30, 2019) (holding that student-university contracts "have unique qualities and must be construed to allow the university's governing body to meet its educational and doctrinal responsibilities," therefore, "it is not the role of the Court to advocate for best practices") (citing *Valente v. Univ. of Dayton*, 438 Fed. App'x 381, 384 (6th Cir. 2011)).

In *Paynter v. New York Univ.*, 319 N.Y.S.2d 893 (App. Div. 1st Dept. 1971) (*per curiam*), the New York Supreme Court Appellate Division addressed the specific issue of whether a student is entitled to a refund of tuition because an educational institution is forced to cancel classes due to circumstances beyond its control. There, the trial court awarded the father

of a student a refund of tuition for class time that he claimed was lost due to the suspension of

classes following anti-war demonstrations that developed outside of the university after the

announcement that American troops had been ordered into Cambodia and four students had been

shot and killed at Kent State by a unit of the National Guard. *Id.* at 893. In reversing the trial

court's award, the court held:

> Private colleges and universities are governed on the principle of self-regulation,
> free to a large degree, from judicial restraints, and they have inherent authority to
> maintain order on their campuses. In light of the events on the defendant's
> campus and in college communities throughout the country . . . the court erred in
> substituting its judgment for that of the University administrators and in
> concluding that the University was unjustified in suspending classes for the time
> remaining in the school year prior to the examination period. Moreover, while in a
> strict sense, a student contracts with a college or university for a number of
> courses to be given during the academic year, the services rendered by the
> university ***cannot be measured by the time spent in a classroom***.

*Id.* at 894 (emphasis added). In *Paynter*, NYU completely ***cancelled*** classes in response to an

unforeseen national emergency, and the appellate court held that there was no cause of action.

Here, Quinnipiac continued to hold its classes, only shifting classes online in response to a global

pandemic, which it had the "inherent authority" to do in order to protect the safety of its students,

faculty, and staff. *Id.*

All of the Plaintiffs' claims are quintessential educational malpractice claims because

they relate to the Plaintiffs' complaints about the subjective quality or value of the education that

they received following Quinnipiac's decision to close its campus and transition to online

learning. (Am. Compl. ¶¶ 2, 7, 66, 74, 102, 112.) For example, the Plaintiffs allege that they paid

Quinnipiac for a "comprehensive academic experience," but received "something far less." (*Id*. ¶

2.) They also allege that they "did not receive the full-value of the services paid" and "did not

receive the benefits of in-person instruction," and that the online classes were "less valuable

than" in-person classes and, therefore, they should be refunded a pro rata portion of their tuition and fees. (*Id.* ¶¶ 7, 102, 112.)

Under the principles enunciated in *Gupta*, this Court cannot second-guess Quinnipiac's decision to transition to online learning in the face of the COVID-19 pandemic. *Gupta*, 239 Conn. at 591; *see also Grutter*, 539 U.S. at 329 (holding that a university has the academic freedom "to make its own judgments as to education"); *Bakke*, 438 U.S. at 312 (holding that an essential freedom of a university is to determine for itself how education shall be taught); *Madej*, 2020 WL 1614230, at *8 ("in matters involving academic judgment, courts must defer to academic institutions") (citing *Ruggiero v. Yale Univ.*, No. 3:06-cv-1165 (WWE), 2007 WL 2684631, at *2 (D. Conn. Sept. 10, 2007) (citing *Gupta*)); *Paynter*, 319 N.Y.S.2d at 894 ("the court erred in substituting its judgment for that of the University administrators").

Furthermore, under *Gupta*, neither this Court nor a jury can determine whether, in the words of the Plaintiffs' own Amended Complaint, online classes are "less valuable than" in-person classes. (Am. Compl. ¶¶ 102, 112). For instance, the factfinder would be asked to assess the following types of inquiries:

- whether a lecture in an accounting class is in fact of lesser educational benefit or value if it is given virtually through Zoom as opposed to live in a classroom and, if so, to what extent is the benefit or value decreased;

- whether a student's virtual or telephonic interaction with a faculty member outside of the lecture time had substantively less educational value or impact than if the conversation had been in person, and, if so, to what extent; and

- whether alternate forms of course-related services (such as remote library services) that were available to students after campus closed failed to provide an educationally-appropriate level of support.

These are precisely the types of inquiries that are prohibited under *Gupta*. 239 Conn. at 590 (holding that such analysis would require the factfinder to "evaluate the course of instruction

[and] . . . review the soundness of the method of teaching," which is "a project that the judiciary is ill equipped to undertake"); *see also Bakke*, 438 U.S. at 312.[10]

For all of these reasons, none of the Plaintiffs' claims is cognizable under the educational malpractice doctrine and the Amended Complaint should be dismissed on this basis alone.

### C.       The Plaintiffs Have Failed to State Any Claim for Breach of Contract

The Plaintiffs have also failed to state a claim for breach of an express or implied contract because they have not alleged (1) that the educational program provided by Quinnipiac failed in a fundamental respect that is objectively measurable, (2) that there was a specific identifiable promise to provide in-person on-campus instruction exclusively or to provide a prorated refund of tuition and fees in the event of a necessary change in instructional format, and (3) that Quinnipiac acted in bad faith by closing its classes and transitioning to online learning in response to the pandemic.

A breach of contract claim consists of the following elements: (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages. *Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*, 311 Conn. 282, 291 (2014). A breach of implied contract claim has the same elements, *Rosato v. Mascardo*, 82 Conn. App. 396, 411 (2004), but an implied contract in fact depends on an actual agreement and requires, as a foundation, that there be an obligation created by law that imposes a duty to perform, *Therrien v. Safeguard Mfg. Co.*, 180 Conn. 91, 94-95 (1980) (citations omitted); *see also Molaver v. Thomas*, 125 Conn. App. 88, 96 (2010) (implied contracts require a "meeting of the minds").

---

[10] Indeed, if such inquiries were permitted, a potential flood of litigation against educational institutions could be unleashed. What would prevent a student from suing for a partial tuition refund if a professor fell ill during the semester and another professor had to fill in who the student viewed as providing a lesser educational experience? What if a class was listed as being held in a certain classroom, but then had to be moved to another venue that the student viewed as providing less value? This is a slippery slope on which this Court should not embark.

Connecticut courts have recognized a contractual relationship between students and educational institutions. *Burns v. Quinnipiac Univ.*, 120 Conn. App. 311, 320-21 (2010); *Gupta*, 239 Conn. at 583. "In examining an educational contract, documents, such as the catalogues, bulletins, circulars, and regulations of an institution, as well as the oral and written expressions of the parties, may result in contractual obligations and define the scope of these obligations." *McNeil v. Yale Univ.*, 436 F. Supp. 3d 489, 529 (D. Conn. 2020) (citing *Burns*, 120 Conn. App. at 321-22). While the interpretation of the written terms of a contract and the degree of compliance by the parties are questions for the trier of fact, the determination of what the parties intended is a question of law when there is definitive contract language. *McNeil*, 436 F. Supp. 3d at 529 (citing *Burns*, 120 Conn. App. at 322, and *Issler v. Issler*, 250 Conn. 226, 235 (1999)).

There are three circumstances in which a claim may be brought against an institution for breach of a contract for educational services. The first circumstance exists when "the educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field." *Id.* at 531. The second circumstance occurs if the school "failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program." *Id.* And the third circumstance occurs if the institution acted "arbitrarily, capriciously, or in bad faith," in a "substantial departure from academic norms." *Gupta*, 239 Conn. at 595. The Plaintiffs' breach of contract claims do not fall within any of these circumstances.

18

1.      **The Plaintiffs Have Not Alleged That the Educational Program Offered by Quinnipiac Failed in Some Fundamental Respect**

The Plaintiffs have not alleged any facts that would support the notion that Quinnipiac's educational program in the Spring 2020 semester failed in a fundamental way. Any "alleged fundamental failure of the educational program must be objectively measurable. A claim that invites inquiry into subjective aspects of a program, such as quality or methodology, implicates the policy considerations the court discussed in *Gupta* . . . ." *Tankoos v. Mead Sch. for Human Dev.*, No. X05CV950145853S, 1999 WL 391350, at *5 (Conn. Super. Ct. June 4, 1999); *see also Cullen*, 2003 WL 23112678, at *3 (same). An "objectively measurable" fundamental failure requires something as comprehensive, concrete, and conclusive as when an institution does not offer any of the courses necessary to obtain certification in a particular field, *Gupta*, 239 Conn. at 592-93; *McNeil*, 436 F. Supp. 3d at 531, or fails to provide the number of days/hours required to complete a course of study, *Cullen*, 2003 WL 23112678, at *3. Anything less would require the court to impose its subjective judgment about educational methodology upon university administrators and faculty. *Cullen*, 2003 WL 23112678, at *3.

Here, the Plaintiffs' breach of contract claims cannot plausibly be construed as flowing from any fundamental failure to offer any of the courses necessary to obtain their degrees or to provide the days or hours needed to complete a course of study. Indeed, there are no allegations that Quinnipiac stopped providing any of the courses necessary for the Plaintiffs' degrees, that the Plaintiffs were prevented from completing their registered courses, or that they did not receive credit for the courses that they were enrolled in during the Spring 2020 semester. (*See generally* Am. Compl.) Rather, the Plaintiffs' allegations are their subjective criticisms that there was a decrease in the value of their education following the transition to remote learning. (*Id.* ¶¶

2, 7, 66, 74, 102, 112.) This is precisely the type of subjective inquiry precluded by the Connecticut Supreme Court in *Gupta* and its progeny.

> ### 2.     The Plaintiffs Have Not Alleged That Quinnipiac Breached a Specific Contractual Promise

Despite their amendment, the Plaintiffs have not sufficiently alleged that Quinnipiac breached a specific promise to provide on-campus in-person instruction at all times or to provide any prorated refund of tuition or fees if in-person instruction was not possible.[11] "To constitute a 'specific contractual promise,' the promise on which a plaintiff relied must have been precise and based on specific contractual terms or provisions." *Kloth-Zarard v. Amridge Univ.*, No. 3:09CV606 JBA, 2012 WL 2397161, at *4 (D. Conn. June 25, 2012) (citing *Faigel v. Fairfield Univ.*, 75 Conn. App. 37, 42 (2003)); *see also Vogel*, 58 Conn. App. at 630 (noting that a viable breach of contract claim could exist "if the educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program"). It is not enough to cite general, vague, or aspirational language, or to suggest that the requisite specificity can be implied from such general language. *Hope Acad. v. Friel*, No. CV030081183S, 2004 WL 1888909, at *2 (Conn. Super. Ct. July 22, 2004) ("The second *Gupta* exception is narrow. It requires proof by a fair preponderance of the evidence, that the educational institution 'failed to provide **specifically promised** educational services.'") (quoting *CenCor*, 868 P.2d at 399 (emphasis supplied by *Hope Academy* court)). "General or vague promises do not suffice." *Id.* (citation omitted); *see also Anthes v. New York Univ.*, No. 17cv2511 (ALC), 2018 WL 1737540, at *13 (S.D.N.Y. Mar. 12, 2018) (dismissing breach of contract claim because general statements

---

[11] To the extent that any implied contract between Quinnipiac and each of the Plaintiffs exists, it was, at most, that Quinnipiac would provide them the ability to earn academic credits and, ultimately, a degree, in exchange for tuition payments. *Gally*, 22 F. Supp. 2d at 206 ("When a student enrolls at a university, an implied contract arises: if the student complies with the terms prescribed by the university, she will obtain the degree she seeks."). The Plaintiffs fail to allege a "meeting of the minds" between Quinnipiac and its students on anything more than that. *Molaver*, 125 Conn. App. at 96.

of policy are insufficient), *aff'd sub nom.*, *Anthes v. Nelson*, 763 Fed. App'x 57, 60 (2d Cir. 2019); *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 708-09 (D. Vt. 2012) ("Not all terms in a student handbook are enforceable contractual obligations, however, and courts will only enforce terms that are 'specific and concrete.'") (quoting *Reynolds v. Sterling Coll., Inc.*, 750 A.2d 1020, 1022 (Vt. 2000)).

In addition, Connecticut courts have recognized that an educational institution "is a living, changing thing," that "may not reasonably be expected to remain static" and "change may be reasonably expected." *Soderbloom*, 1992 WL 24448, at *4 (quoting *Perretti v. Montana*, 464 F. Supp. 784, 786 (D. Mont. 1979), *rev'd on other grounds*, 661 F.2d 756 (9th Cir. 1981)). "Hence, each statement in a publication of what now is true does not necessarily become a term in the contract between the school and the student." *Id.*; *see also McNeil*, 436 F. Supp. 3d at 529 (noting that academic catalogues, bulletins, and other documents *may* result in contractual obligations and define the scope of these obligations) (citing *Burns*, 120 Conn. App. at 321-22); *see also Soueidan v. St. Louis Univ.*, 926 F.3d 1029, 1036 (8th Cir. 2019) (holding that courts should not "wade[] into the issue of how closely [a university] operated within the constructs of . . . the aspirational [university handbook and catalog] provisions cited by [the plaintiff],'" because this would require "'an educational malpractice analysis rife with  . . . practical and policy concerns'") (quoting *Gillis v. Principia Corp.* 111 F. Supp. 3d 978, 985 (E.D. Mo. 2015), *aff'd*, 832 F.3d 865 (8th Cir. 2016)).

On October 1, 2020, the United States District Court for the District of Massachusetts granted in part a motion to dismiss in a similar tuition refund class action and dismissed nearly all of the plaintiffs' claims. *See Chong v. Northeastern Univ.*, No. 20-10844-RGS, 2020 WL 5847626 (D. Mass. Oct. 1, 2020). In *Chong*, the plaintiffs sought a prorated refund of tuition and

fees for the time that Northeastern closed its campus and transitioned to remote learning during the Spring 2020 semester because of the pandemic. *Id.* at *1. They asserted breach of contract and unjust enrichment claims against Northeastern on behalf of three putative classes: (1) a Tuition Class; (2) an Undergraduate Fees Class; and (3) a Graduate Fees Class. *Id.* at *2.

All Northeastern students executed an Annual Financial Responsibility Agreement ("FRA") with the university, which provided that, in exchange for the opportunity to enroll at Northeastern and receive educational services, the students accepted responsibility to pay all tuition, fees and other associated costs assessed as a result of the students' registration and/or receipt of services. *Id.* at *1. The court dismissed the breach of contract claims as to the Tuition Class, finding that the plaintiffs "have not plausibly established that the parties' agreement included a right to in-person instruction" and noting that the FRA tied the payment of tuition to registration for courses, but not to the receipt of any particular method of course instruction. *Id.* at *3. The court rejected the plaintiffs' contention that in-person instruction became part of the parties' contract when they registered for courses scheduled to be taught within an assigned room in specific buildings, holding that there were not allegations in the complaint that might allow the court to reasonably infer that general descriptions of courses that appeared on Northeastern's registration website were meant to be read in conjunction with the FRA or that students understood that the information on the website was definitive. *Id*.

The court also dismissed most of the plaintiffs' breach of contract claims with respect to the payment of certain student fees charged by Northeastern. *Id.* at *4. Specifically, the court held that because the students paid the student activity fee, the student center fee, and the undergraduate student fee "to 'support' certain facilities during the terms for which those students are enrolled in classes, i.e., ***not to gain access to any on-campus facility or resource***,

the plaintiffs have not stated a claim for breach of contract with respect to these fees." *Id.* (emphasis added). The court allowed the plaintiffs' claims with respect to the campus recreation fee to proceed to the extent that the plaintiffs lost the option to attend home athletic games or use fitness facilities after the campus was closed because a portion of that fee was to give students access to home athletic events and to use campus fitness facilities. *Id.* There is no such campus recreation fee at issue here. Nor is there any allegation in the Amended Complaint that the one fee that the Plaintiffs allege that they paid—the technology fee—was charged in order for the Plaintiffs to gain access to any on-campus facility or resource, nor is there any such provision in the Bulletin. (Am. Compl. ¶ 45; *see generally* Dkt. 25-3.)

*Squeri v. Mount Ida College*, 954 F.3d 56 (1st Cir. 2020), a recent decision by the First Circuit is also instructive. There, the First Circuit affirmed the dismissal of a breach of contract claim brought by a putative class against a college that had to abruptly close due to insolvency. *Id.* at 61-62. The court held that the plaintiffs failed to state a claim for breach of contract because they "d[id] not allege the terms of any . . . contract or that specific terms required earlier disclosure of the closing" of the college. *Id.* at 71-72. Although the plaintiffs made "passing reference to enrollment deposits and the fact that students gave up the chance to enroll at other schools by choosing Mount Ida," the plaintiffs "fail[ed] to explain how these actions formed an express or implied contract which obligated Mount Ida to provide earlier notice of its difficulties to its students than it did." *Id.* at 71-72. The court further held that because there was no dispute that Mount Ida delivered a semester of education before it closed, the allegations did "not plausibly allege a breach of implied contract, let alone an express contract, that the college contracted to give earlier notice than it did or that there was a contract for four years of education in exchange for only one semester of tuition." *Id.* at 72.

Here, the Plaintiffs have not alleged that Quinnipiac breached any promise based on a specific contractual term or provision to always provide in-person classes, nor have they cited to any language that would obligate Quinnipiac to return tuition and fees if it was forced to close its campus and transition to online learning because of a global pandemic. (*See generally* Am. Compl.) Rather, the Plaintiffs cite to general and aspirational language from Quinnipiac's website and the Bulletin—none of which amounts to a specific concrete promise to provide in-person education at all times and under any circumstances.

For example, the Plaintiffs cite to aspirational language on Quinnipiac's website that states that students will "become part of our vibrant community . . . ." and to language touting the residential experience at Quinnipiac, which, among other things, notes that its campuses are "purposefully designed for living and learning." (Am. Compl. ¶¶ 27-28; *see also id.* ¶ 31.) The Plaintiffs also cite to general statements on Quinnipiac's Admissions webpage, which describe Quinnipiac as "unique" because of its "focus on career readiness" because it provides "***a combination*** of classroom theory and practical experience tailored to meet what the market demands, we expose you to the life-changing challenge of working and learning in the community and around the globe." (*Id.* ¶ 29 (emphasis added); *see also id.* ¶ 30 ("Your plan will include a combination of classroom and immersive experiential learning . . . .")). In this context, "classroom" is clearly meant to reference lectures and instruction (as opposed to experiential learning) rather than students physically sitting in a room with a professor. The Plaintiffs also cite to certain Psychology classes being assigned to certain classrooms on campus.[12] (*Id.* ¶ 33.) However, these statements are general and merely aspirational, and do not enumerate a specific

---

[12] The Plaintiffs do not allege that they or their children are Psychology majors or attended any of these Psychology classes. (*Id.* ¶¶ 10-13.) More significantly, the listing of a specific location for classes does not give rise to a concrete contractual obligation to conduct the class in that location. If it did, a university would face liability any time that a specific room's photograph was used in a brochure or catalog but was ultimately not the one used for a particular class or anytime a classroom change occurred.

enforceable promise for exclusively in-person learning at all times. *Gally*, 22 F. Supp. 2d at 208; *see also McNeil*, 436 F. Supp. 3d at 532 (holding that "general language . . . from Yale's Equal Opportunity Statement and Undergraduate Regulations and Sexual Misconduct Policies cannot result in specific contractual promises" and that the breach of contract claim seeking the enforcement of an alleged promise to eradicate sexual misconduct would involve the judiciary in the impermissible and awkward task of defining what constitutes a reasonable educational program); *Knelman*, 898 F. Supp. 2d at 709 ("Language in a college handbook or other official statement that is merely aspirational in nature, or that articulates a general statement of a school's 'ideals,' 'goals,' or 'mission,' is not enforceable.").

The Plaintiffs also allege that the Bulletin "establishes that 'on-campus' students in both undergraduate and graduate programs have unique academic calendars, registration procedures, and withdrawal refund schedules." (Am. Compl. ¶ 36.) However, the Bulletin distinguishes between "undergraduate and graduate classes" and "online classes." (*See, e.g.*, Dkt. 25-3, at 14 of 749.) There is only one reference in the Bulletin to "on-campus students" and that is with respect to "part-time, on-campus students" registered in the MBA program, which none of the Plaintiffs allege that they or their children are. (*Id.* at 359 of 749; *see also* Am. Compl. ¶¶ 10-13.) The fact that Quinnipiac offers both on-campus classes and online classes does not amount to a specific promise to always provide on-campus classes to those students who elect them, and none of the language cited by the Plaintiffs supports the notion that it does. (Am. Compl. ¶¶ 38-42.)[13]

Neither does the allegation that Quinnipiac's "usual and customary practices when

---

[13] The Plaintiffs' allegation pertaining to the description of "on-campus courses" describes "[t]he mission of the Department of Chemistry and Physical Sciences" and is not a specific promise by Quinnipiac to always provide "small classes with access to faculty and well-equipped laboratory facilities" to each of its students. (*See* Dkt. 25-3, at 168 of 749.)

students register for on-campus courses . . . is to provide on-campus instruction" create a specific contractual promise. (*See, e.g.*, *id.* ¶ 42.) Recognition that Quinnipiac normally provides in-person instruction is not a promise to lock the school exclusively into that format regardless of circumstances, such as during a pandemic when in-person instruction poses a significant health risk. *See, e.g.*, *Itek Corp. v. First Nat'l Bank of Boston*, 566 F. Supp. 1210, 1216 (D. Mass. 1983) ("What was contractually 'customary' and 'necessary' in 1977 [prior to the Iranian revolution] does not, in the face of dramatically changed circumstances, exert binding force on the parties and this Court.").

Even if the statements in the Bulletin or Quinnipiac's customs constituted a specific promise to provide in-person classes at all times (which they do not), Quinnipiac "reserve[d] the right to change any provision of the [Bulletin] at any time." (*See* Dkt. 25-3, at 3 of 749.) Quinnipiac specifically reserved this right because, as Connecticut courts have recognized, "universities must have the flexibility to make changes in furtherance of their educational responsibilities." *Soderbloom*, 1992 WL 24448, at *4 (noting that Yale's bulletin provided that the university reserved the right to withdraw or modify courses of instruction or change instructors at any time and that this reservation of rights included both academic and non-academic activities). It was Quinnipiac's responsibility to find the safest way to allow its students to complete the Spring 2020 semester, which it determined was to close its campus and transition to remote learning. (*See also* Am. Compl. ¶ 63 (alleging that the reasons for the closure was justified).)

Finally, there is no provision in the Bulletin that allows for a refund of tuition under these circumstances. (*See* Dkt. 25-3, at 463 of 749.) Rather, prorated refunds of tuition and fees are only available if a student withdraws from a class before the fifth week of the Spring 2020 term.

(*Id.*) At the time of the transition to online learning, Quinnipiac had held seven weeks of in-person classes. (*Id.* at 14 of 749.) There is no contractual provision allowing for a refund of any tuition and fees under the circumstances alleged here. (*Id.* at 463 of 749.) Moreover, the Plaintiffs do not allege that they withdrew or requested to withdraw from Quinnipiac when classes shifted online. The Plaintiffs, on behalf of themselves or their children, chose to continue to receive an education and collect the credits from completing the semester's courses, effectively consenting to the change in logistics.

Accordingly, the Plaintiffs have not stated any claim for breach of contract, either express or implied, that is based on specific contractual terms or provisions, as required by *Gupta*. *Kloth-Zanard*, 2012 WL 2397161, at *4.

### 3.    The Plaintiffs Have Not Alleged That Quinnipiac Acted in Bad Faith

The Plaintiffs have also not stated a breach of contract claim against Quinnipiac because they have not alleged that Quinnipiac acted in bad faith. In *Gupta*, the Connecticut Supreme Court held that "an educational institution does not have license to act arbitrarily, capriciously, or in bad faith," and that "[s]uch a substantial departure from academic norms . . . may constitute the breach of an education contract by a private institution." *Gupta*, 239 Conn. at 595 (citations omitted). However, the court also noted that students bear "a heavy burden in proving that [the university's decision] resulted from arbitrary, capricious, or bad faith conduct . . . . To prevail, [students] must show that the [university's] decision had no discernable rational basis." *Id.* at 596.

Here, there are no allegations in the Amended Complaint that Quinnipiac acted arbitrarily or without a rational basis. Indeed, the Plaintiffs allege that Quinnipiac's reasons for closing campus and transitioning to online classes were "justified" in light of the global pandemic. (Am.

Compl. ¶ 63.) For all of these reasons, the Plaintiffs have failed to state any claim for breach of contract.

### D.  The Plaintiffs Have Failed to State a Claim for Unjust Enrichment

As discussed above, the Plaintiffs' unjust enrichment claim fails as a matter of law under the holdings in *Gupta*. 239 Conn. at 590. In *Tankoos*, the Superior Court relied on *Gupta* to grant a motion to strike an unjust enrichment claim seeking a refund of tuition because the "[i]nquiry into whether the defendant was unjustly enriched by receipt of the plaintiffs' tuition payments requires an examination of the quality and value of services provided in return." *Tankoos*, 1999 WL 391350, at *9. The court further held that it was irrelevant whether the claim was "brought as negligence, breach of contract or, as here, unjust enrichment claims. The plaintiffs cannot disguise their impermissible claims sounding in negligence and breach of contract as an unjust enrichment claim." *Id.*; *see also Brodsky v. Mead Sch. Sch. For Human Dev.*, No. DNX05CV970156788S, 1999 WL 391580, at *10–11 (Conn. Super. Ct. June 4, 1999) (same); *Fletcher v. Mead Sch. for Human Dev.*, No. X05CV 960152138S, 1999 WL 391583, at *10 (Conn. Super. Ct. June 4, 1999) (same).

The Plaintiffs have also failed to state a claim for unjust enrichment. The relevant standard for such a claim is well-settled:

> Unjust enrichment applies wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract. A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another . . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard . . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy . . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the

plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment.

*Hartford Whaler's Hockey Club v. Uniroyal Goodrich Tire Co.,* 231 Conn. 276, 282-83 (1994) (citations and internal quotation marks omitted).

In addition, an unjust enrichment claim cannot be maintained where, as here, there is an enforceable contract. *See Vertex, Inc. v. Waterbury,* 278 Conn. 557, 570 n. 12, (2006) ("[P]roof of an operative contract [is] incompatible with recovery on an unjust enrichment theory"); *Feng v. Dart Hill Realty, Inc.,* 26 Conn. App. 380, 383 (1992) ("Proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment."); *Harris v. Shea,* No. CV010085838S, 2002 WL 31939113, at *3 (Conn. Super. Ct. Dec. 24, 2002) ("Where . . . there is an enforceable express or implied in fact contract that regulates the relations of the party . . . or that part of their relations about which issues have arisen, there is no room for quasi contract."); *see also Chong,* 2020 WL 5847626, at *4 (dismissing the plaintiffs' unjust enrichment claims because the plaintiffs "have an adequate alternative remedy available to challenge [the] retention of tuition and fees" and because "Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment").

The Plaintiffs have alleged the existence of an enforceable contract. (Am. Compl. ¶ 35 ("Quinnipiac's 2019-2020 Official Bulletin . . . lays out the terms of the contract between Quinnipiac and Plaintiffs and Class Members . . . .").) Further, Connecticut courts have recognized a contractual relationship between students and educational institutions that is "defined by the catalogues, bulletins, circulars and regulations of the institution." *Madej*, 2020 WL 1614230, at *9. Here, the Bulletin governed the payment of the Plaintiff's tuition and fees, and any possible refunds thereof, without promising exclusively in-person instruction. (*See, e.g.*, Dkt. 25-3, at 21, 463 of 749.)

The Plaintiffs' allegation that the contract is illusory because the Bulletin permitted Quinnipiac to unilaterally and without notice change the terms under which Plaintiffs and/or their children and Class Members were to receive instruction does not save their unjust enrichment claim. (Am. Compl. ¶ 115.) "The tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears the parties intended a contract." *HLO Land Ownership A. Ltd. v. Hartford*, 248 Conn. 350, 363 (1999). Furthermore, "[a]n implied obligation to use good faith is enough to avoid the finding of an illusory promise." *Id.*; *Sicaras v. Hartford*, 44 Conn. App. 771, 781 (1997).

As noted, the Plaintiffs have alleged the existence of a contract. (Am. Compl. ¶ 35.) Unfortunately for the Plaintiffs, the contract does not say what they would like it to say for purposes of this lawsuit. The fact that Quinnipiac reserved the right to change certain provisions of the Bulletin at any time does not render the contract illusory. *See Stern & Co. v. Int'l Harvester Co.*, 148 Conn. 527, 530 (1961) (holding that the right of each party to cancel the contract did not result in the creation of an illusory contract; rather, the contract remained operative until the power of cancellation was properly exercised). Moreover, Quinnipiac's obligation to use good faith "is enough to avoid the finding of an illusory promise." *HLO Land*, 248 Conn. at 363. There can be no argument that, given the pandemic and Governor Lamont's "Stay Safe, Stay Home" restrictions, Quinnipiac did not act in good faith in closing its campus and transitioning classes online. Indeed, the Plaintiffs concede that Quinnipiac's decision was justified. (Am. Compl. ¶ 63.) There is simply no basis for finding an illusory contract between Quinnipiac and the Plaintiffs.

Finally, the Plaintiffs' unjust enrichment claim also fails because they have not alleged any supporting allegations that Quinnipiac unjustly retained non-gratuitous benefits conferred by

the Plaintiffs. *Roe v. Loyola Univ. New Orleans*, No. 07-1828, 2007 WL 4219174 (E.D. La. Nov. 26, 2007), a factually similar case, is instructive. There, the plaintiff was a third-year law student at Loyola in New Orleans when Hurricane Katrina hit on August 29, 2005. *Id.* at *1. The American Bar Association, the American Association of Law Schools, and the deans of Loyola and Tulane Law School developed an emergency measure to enable students from Loyola and Tulane to attend classes and receive full credit at other ABA-accredited law schools, provided that they paid their tuition for the Fall 2005 semester to their home universities. *Id.* The plaintiff attended SMU Law School as a visiting student and received full credit for his courses there towards his Loyola degree. He returned to Loyola for the Spring 2006 semester and graduated on schedule. *Id.*

The plaintiff subsequently instituted a putative class action against Loyola, first on behalf of all law students and subsequently on behalf of all Loyola graduate and undergraduate students, asserting that because Loyola was not able to offer classes in New Orleans during the Fall 2005 semester, he and all putative class members should be refunded their tuition. *Id.* As here, he asserted breach of contract and unjust enrichment claims.[14] *Id.* The court dismissed the plaintiff's unjust enrichment claim against Loyola because the plaintiff could not show that he was impoverished by having to pay for tuition for academic credits that he received, which allowed him to graduate and sit for the bar exam on time. *Id.* at *3. The court further held that there was no absence of justification or cause for Loyola's retention of tuition for the Fall 2005 semester because, but for the actions of Loyola in allowing its students to attend another school, Loyola students would have fallen behind, not received their course credits for the semester, and

---

[14] The court rejected the plaintiff's breach of contract claim, finding that he had "pointed to no provision of the student bulletin or Handbook that would entitle him to a free semester of law school" or to attend school in New Orleans. *Id.* at *2. In so holding, the court also noted that Loyola provided the plaintiff with the benefit of receiving necessary law school classes at SMU through its emergency measures. *Id.*

been delayed in receiving their degrees. *Id.* Indeed, the court noted that "if Loyola were required to reimburse plaintiff for the Fall 2005 tuition payments he made, plaintiff would be unjustly enriched as a result." *Id.*

The same is true here. Governor Lamont's "Stay Safe, Stay Home" restrictions on all workplaces for non-essential businesses, became effective as of March 23, 2020. (Am. Compl. ¶ 62 and n.27.). Even if Quinnipiac had not decided to close its campus and transition to online classes as of that date, it would have been required to do so by this Executive Order. Quinnipiac's extensive emergency planning measures, which enabled a smooth transition to online education, allowed its students to continue with their necessary coursework, receive their course credits for the semester, and not be delayed in receiving their degrees. If Quinnipiac was required to refund any portion of the Plaintiffs' tuition for the Spring 2020 semester, then it would be the Plaintiffs who would be unjustly enriched, not Quinnipiac. *Roe*, 2007 WL 4219174, at *3.

The Plaintiffs' allegation that they "and the Class Members directly conferred non-gratuitous benefits upon Defendant, *i.e.*, monetary payments for tuition, fees, and/or room and board, so that Plaintiffs and the Class Members could avail themselves of in-person educational opportunities and utilize campus facilities, including campus dormitories," (Am. Compl. ¶ 116), omits the primary purpose for the payment of tuition and fees—to obtain academic credit toward a degree, which was indisputably provided to the Plaintiffs after the transition to online learning. In short, the Plaintiffs' allegations are insufficient to provide a plausible "entitlement to relief." *Iqbal*, 556 U.S. at 678. The unjust enrichment claim should be dismissed.

### E.     The Plaintiffs Have Failed to State a Claim for Conversion

"The tort of [c]onversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights . . . . Thus,

[c]onversion is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm." *Deming v. Nationwide Mut. Ins. Co.*, 275 Conn. 745, 770 (2006) (citation and quotations omitted). A plaintiff must allege "that (1) the material at issue belonged to the plaintiff, (2) that [the defendant] deprived the plaintiff of that material for an indefinite period of time, (3) that [the defendant's] conduct was unauthorized and (4) that [the defendant's] conduct harmed the plaintiff." *Coster v. Duquette*, 119 Conn. App. 827, 832 (2010) (internal quotations omitted).

The Plaintiffs have failed to state a claim for conversion for three reasons. First, as discussed above, the Plaintiffs' conversion claim is prohibited by the educational malpractice doctrine because adjudication of this claim would require this Court to second-guess Quinnipiac's academic decision-making. *Gupta*, 239 Conn. at 590.

Second, the Plaintiffs' claim that they are entitled to a refund of tuition and fees is a claim sounding in breach of contract, not conversion. *Aztec Energy Partners, Inc. v. Sensor Switch, Inc.*, 531 F. Supp. 2d 226, 230-231 (D. Conn. 2007) ("Clearly, Aztec expected to receive a refund in exchange for returning the products and relinquishing title to them, but that is a claim sounding in breach of contract, not conversion."). "A mere obligation to pay money may not be enforced by a conversion action . . . and an action in tort is inappropriate where the basis of the suit is a contract, either express or implied." *Macomber v. Travelers Prop. & Cas. Corp.,* 261 Conn. 620, 650 (2002) (citing *Belford Trucking Co. v. Zagar,* 243 So.2d 646, 648 (Fla. App. 1970)); *see also Deming*, 275 Conn. at 772 (holding that when an action arises from a claim under an express or implied contract, a claim in tort is inappropriate); *Cherry Hill Constr. Inc. v.*

*E.F.S. Mach., LLC*, No. CV156053196S, 2015 WL 3975711, at *4 (Conn. Super. Ct. June 3, 2015) (holding that the plaintiff's conversion claim arising out of the plaintiff's alleged failure to return a deposit was legally insufficient because the transaction arose out of a contract).

Third, the Plaintiffs have not alleged sufficient facts to establish that "the money claimed . . . ***at all times belonged to the plaintiff*** and that the defendant converted it to his own use." *Deming*, 275 Conn. at 772 (emphasis added). To the contrary, the Plaintiffs allege that they and the Class Members willingly paid Quinnipiac tuition, fees, and/or room and board in order to "receive educational services, activities, and access to Defendant's facilities for the Spring 2020 term." (Am. Compl. ¶¶ 125.) Thus, this unspecified amount of money that the Plaintiffs claim is owed to them did not at all times belong to them as required to state a claim for conversion. *Deming*, 275 Conn. at 772.

Furthermore, the conversion claim also fails because the Plaintiffs have not specifically identified the funds at issue. *See Macomber*, 261 Conn. at 651 (comparing claim for money to claim for specific chattel and noting similar requirement that funds at issue be specifically identifiable); *Pelizari v. Pisciotta*, No. TTDCV085002792S, 2009 WL 1577821, at *2 (Conn. Super. Ct. May 8, 2009) (granting motion to strike counterclaim reasoning that "[i]t is inadequate to allege conversion of funds which are merely the satisfaction of an obligation to pay money. The counterclaimant must allege and prove that specific money, as identifiable chattel, belonged 'at all times' to her. Mere indebtedness, dischargeable by the payment of money fails to constitute conversion.") (citing *Macomber*).

Accordingly, the Plaintiffs have not alleged sufficient factual allegations, accepted as true, to state a claim for conversion that is plausible on its face. *Iqbal*, 556 U.S. at 678. The conversion claim should also be dismissed.

## IV.    CONCLUSION

For all of the foregoing reasons, the Defendant Quinnipiac University respectfully requests that its Motion to Dismiss the First Amended Class Action Complaint be granted and the Complaint be dismissed with prejudice.

<div style="margin-left: 50%;">

DEFENDANT,
QUINNIPIAC UNIVERSITY,


By     */s/ Edward J. Heath*
    Edward J. Heath (ct20992)
    Wystan M. Ackerman (ct24090)
    Elizabeth R. Leong (ct24453)
    Dan A. Brody (ct30301)
    Robinson & Cole LLP
    280 Trumbull Street
    Hartford, CT 06103-3597
    Tel. No.: (860) 275-8200
    Fax No.: (860) 275-8299
    E-mail: eheath@rc.com;
    wackerman@rc.com; eleong@rc.com;
    dbrody@rc.com

</div>

**CERTIFICATION**

I hereby certify that on October 5, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Edward J. Heath*
Edward J. Heath