## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ZOEY METZNER, DOMINIC GRAVINO, DAVE BRUNEAU, RICHARD HOTTER, individually and on behalf of all others similarly situated,<br>　　　*Plaintiffs*, | Case No. 3:20-cv-00784 (KAD) |
| 　　v. | |
| QUINNIPIAC UNIVERSITY,<br>　　　*Defendant.* | March 25, 2021 |

## MEMORANDUM OF DECISION
## RE: DEFENDANT'S MOTION TO DISMISS (ECF NO. 35)

Kari A. Dooley, United States District Judge:

Defendant Quinnipiac University ("Quinnipiac" or the "Defendant") has moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the claims of Plaintiffs Zoey Metzner ("Metzner"), Dominic Gravino ("Gravino"), Dave Bruneau ("Bruneau"), and Richard Hotter ("Hotter," and collectively, the "Plaintiffs") asserted in Plaintiffs' First Amended Complaint (the "FAC," ECF No. 25). In this putative class action, Plaintiffs bring claims against Quinnipiac for breach of contract, unjust enrichment, and conversion arising out of Quinnipiac's alleged failure to issue tuition or fee refunds to students following its decision to transition to online learning during the Spring 2020 semester in response to the COVID-19 pandemic. Metzner and Gravino were both enrolled as full-time students at Quinnipiac during the 2019-2020 academic year. (FAC ¶¶ 10–11.) Bruneau and Hotter (the "Parent Plaintiffs") are each parents of undergraduate students who were enrolled full-time at Quinnipiac during the 2019-2020 academic year. (*Id*. ¶¶ 12–13.) Following oral argument on the motion to dismiss, the Court directed the parties to file supplemental briefs addressing whether the Parent Plaintiffs have plausibly alleged the requirements of Article III

1

standing with respect to the theories of liability asserted in the FAC.  (ECF No. 65.)  The Court

has considered the parties' supplemental briefs (ECF Nos. 68, 69), in addition to Quinnipiac's

supporting memorandum of law (ECF No. 36), Plaintiffs' opposition memorandum (ECF No. 40),

Quinnipiac's reply brief (ECF No. 46), and the various notices of supplemental authority filed by

the parties.  (ECF Nos. 56, 62, 66–67, 70–75.)  For the reasons that follow, the motion to dismiss

is GRANTED in part and DENIED in part and the Parent Plaintiffs' breach of contract and unjust

enrichment claims are DISMISSED for lack of standing.

**Legal Standards**

"Article III, Section 2 of the Constitution limits the jurisdiction of the federal courts to the

resolution of 'cases' and 'controversies.'"  *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir.

2012) (quotation marks omitted).  "This limitation is 'founded in concern about the proper—and

properly limited—role of the courts in a democratic society.'"  *Id*. (quoting *Warth v. Seldin*, 422

U.S. 490, 498 (1975)).  "The doctrine of standing gives meaning to these constitutional limits by

'identifying those disputes which are appropriately resolved through the judicial process.'"  *Susan

B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560 (1992)).  "Because the standing issue goes to this Court's subject matter

jurisdiction, it can be raised *sua sponte.*"  *Cent. States Se. & Sw. Areas Health & Welfare Fund v.

Merck-Medco Managed Care, L.L.C*., 433 F.3d 181, 198 (2d Cir. 2005).  "To establish Article III

standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between

the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed

by a favorable decision.'"  *Susan B. Anthony List*, 573 U.S. at 157–58 (quoting *Lujan*, 504 U.S. at

560–61.)  In determining whether a plaintiff has standing to sue, this Court must accept the

complaint's material allegations as true and construe the allegations in the plaintiff's favor.

*Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l*, 790 F.3d 411, 417 (2d Cir. 2015).

On a motion to dismiss under Rule 12(b)(6), the Court must likewise accept the complaint's factual allegations as true and must draw inferences in the plaintiff's favor.  *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015).  The complaint "must 'state a claim to relief that is plausible on its face,'" setting forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Kolbasyuk v. Capital Mgmt. Servs., LP*, 918 F.3d 236, 239 (2d Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct."  *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 556).  At this stage "the court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side."  *Id*.

**Background and Allegations**

The Court summarizes the allegations, which are accepted as true for purposes of the instant motion, in substantially similar form as was set forth in the Court's memorandum of decision denying Quinnipiac's motion to stay discovery.  (ECF No. 47.)  Quinnipiac is an institution of higher education located in Hamden, Connecticut, which has a current enrollment of approximately 10,290 students across its College of Arts and Sciences and eight professional schools.  (FAC ¶¶ 21–22.)  Plaintiffs and Plaintiffs' children registered for on-campus courses during the Spring 2020 semester, which registrations Quinnipiac accepted.  (*Id.* ¶ 45.)  All

Plaintiffs remain in good financial standing with Quinnipiac, "having paid in whole or in combination tuition, fees, costs, and/or room and board charges assessed and demanded by Defendant for the Spring 2020 term." (*Id.* ¶ 14.)

On March 15, 2020, Quinnipiac informed Plaintiffs that beginning on March 18, 2020, classes would be held online for the remainder of the Spring 2020 semester in response to the COVID-19 pandemic. (*Id.* ¶¶ 4, 61.) The online classes that Quinnipiac ultimately provided were not equivalent to the in-person, on-campus education that Plaintiffs and their children chose and deprived the Plaintiffs and Plaintiffs' children of many hands-on educational opportunities and experiences. (*Id.* ¶¶ 67–68.) Quinnipiac has allegedly refused to reimburse or refund Plaintiffs and others similarly situated for the tuition and fees they have expended for on-campus instruction and for programs, services, activities, facilities, events, and other resources and benefits that were no longer available to Plaintiffs and their children as a result of the transition to remote learning. (*E.g.*, *id.* ¶¶ 5–6, 16–18.) Plaintiffs allege that while they and their children could have pursued online degrees, they specifically opted for an in-person classroom experience and that Quinnipiac did not previously offer Plaintiffs' or Plaintiffs' children's degree programs online. (*Id.* ¶ 15.) Plaintiffs further allege that the transition to online learning rendered it difficult to access and communicate with Quinnipiac's professors, many of whom were unprepared to deliver an effective educational experience using remote learning technologies. (*Id.* ¶¶ 19–20.)

The FAC includes a number of examples of how Quinnipiac allegedly emphasizes in-person interactions and experiences and the unique attraction of its campus and facilities in its effort to recruit prospective students, while neglecting to highlight remote learning opportunities as a core educational feature. (*Id.* ¶¶ 24–33.) Plaintiffs allege that they specifically contracted for on-campus instruction for the Spring 2020 semester and principally cite Quinnipiac's 2019-2020

Official Bulletin (the "Bulletin") as setting forth the terms of this contract.  (*Id*. ¶¶ 34–35; Ex. C.) Plaintiffs allege that the Bulletin describes many of its in-person offerings in such terms as providing a "hands-on experience," "campus laboratory experience," "a supportive learning environment characterized by small classes with access to faculty and well-equipped laboratory facilities," "state-of-the-art facilities," and other characteristics that are germane only to on-campus instruction.  (*Id*. ¶ 37.)  According to Plaintiffs, Quinnipiac's default or customary mode of educational delivery is to provide in-person instruction, and when registering for classes for the Spring 2020 semester, Plaintiffs and their children did not otherwise select the box available on Quinnipiac's website which would have enabled them to search and register for "Online Courses Only." (*Id*. ¶¶ 41–42.)  Plaintiffs further allege that Quinnipiac's Spring 2020 courses were listed as being held in specific on-campus locations.  (*Id*. ¶ 33.)  Thus, it was "Plaintiffs' and Class Members' reasonable expectation when registering for classes for the Spring 2020 semester . . . that those classes would be provided on-campus" and Plaintiffs allege that Quinnipiac became contractually obligated to deliver in-person instruction via the Bulletin's express terms in combination with Quinnipiac's other publications and promotional materials.  (*Id*. ¶¶ 42, 44.)

For the Spring 2020 semester Quinnipiac charged its undergraduate students $24,280 in full-time tuition plus a $720 technology fee.  (*Id*. ¶ 45.)  The annual fees for undergraduate room and board ranged from $14,360 to $18,270 and fees for dining services ranged from $1,685 to $1,885 per semester.  (*Id*.)  Plaintiffs allege that these fees "are significantly higher than online-only programs" offered both by Quinnipiac and other institutions of higher education.  (*Id*. ¶¶ 46–47.) For example, for the Spring 2020 semester, Plaintiffs allege that Quinnipiac charged students between $515 and $575 per credit for undergraduate online degree programs, whereas students taking 12-16 credits per semester for on-campus courses were charged between $1,517.50 and

$2,023.33 per credit.  (*Id*. ¶¶ 45, 48.)  Despite having allegedly bargained and paid for on-campus courses and access to campus facilities and other resources for the entire Spring 2020 semester, Plaintiffs and Plaintiffs' children have not been permitted to attend classes in person since March 15, 2020.  (*Id*. ¶¶ 51–52.)

While Quinnipiac made the decision in April 2020 to provide students housing and dining credits for the Spring 2020 semester, it has not offered tuition or fee refunds.  (*Id*. ¶¶ 80–81.) Plaintiffs acknowledge that Quinnipiac's decision to close its campus and to offer its classes exclusively online in March of 2020 in response to the COVID-19 pandemic was justified but assert that they have suffered significant losses as a result of Quinnipiac's refusal to offer a prorated reimbursement of tuition and fees to students who paid for full-time on-campus instruction for the Spring 2020 semester.  (*Id*. ¶¶ 63–67.)  Put simply, Plaintiffs allege that "[t]he online classes Plaintiffs and their peers have been provided are not equivalent to the in-person, campus experience that Plaintiffs and other Quinnipiac students chose for their university education."  (*Id*. ¶ 68.)

Plaintiffs bring claims sounding in breach of contract (Count One); breach of implied contract (Count Two); unjust enrichment in the alternative to the contract claims (Count Three); and conversion (Count IV).  Plaintiffs seek to certify a class pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of themselves and:

> All people paying Defendant, in whole or in part, personally and/or on behalf of others, for tuition, fees, and/or room board for in-person instruction and use of campus facilities, but who were denied use of and/or access to in-person instruction and/or campus facilities by Defendant for the Spring 2020 academic term or any subsequent term.

(*Id*. ¶ 83.)

**Discussion**

### The Parent Plaintiffs' Standing to Sue

As noted previously, Article III standing is comprised of three elements: injury-in-fact, causation, and redressability. *See Lujan*, 504 U.S. at 560–61. "Under the injury-in-fact requirement, 'the first and foremost' element, 'a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.'" *Vullo v. Office of Comptroller of Currency*, 378 F. Supp. 3d 271, 282 (S.D.N.Y. 2019) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016)). As to the second element, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Lujan*, 504 U.S. at 560) (alterations, ellipses, and emphasis omitted). "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (quoting *Lujan*, 504 U.S. at 561).

In their supplemental brief, the Parent Plaintiffs assert that they have satisfied each of the three requirements of Article III standing. They argue that the loss of tuition payments they remitted to Quinnipiac for their children's in-person education constitutes an injury-in-fact, which is fairly traceable to Quinnipiac's decision not to issue tuition or fee reimbursements for the Spring 2020 semester. They further assert that their alleged injuries are redressable through a favorable decision finding Quinnipiac liable to them for compensatory damages.

Quinnipiac, on the other hand, argues that the Parent Plaintiffs lack standing because they do not allege any facts that would establish that they themselves were entitled to on-campus instruction or facilities or that they entered into a contract for educational services with Quinnipiac directly. Nor do the Parent Plaintiffs allege that they were an intended third-party beneficiary of

the alleged contract between Quinnipiac and their children.  As Quinnipiac observes, several courts have dismissed parent-plaintiffs in similar class action lawsuits brought against colleges and universities during the current public health crisis—recognizing that the fact that a parent pays tuition on behalf of his or her child does not confer standing on that parent to sue for breach of an obligation that the college or university owed the child.  *See, e.g.*, *Espejo v. Cornell Univ.*, No. 3:20-CV-467 (MAD/ML), 2021 WL 810159, at *2 (N.D.N.Y. Mar. 3, 2021) ("Plaintiffs do not allege that Plaintiff Espejo's child is a minor, that he directly contracted with Cornell [University], or that he is an intended third-party beneficiary. . . .Without such allegations, Plaintiff Espejo cannot demonstrate injury-in-fact"); *Gociman v. Loyola Univ. of Chicago*, No. 20 C 3116, 2021 WL 243573, at *2 (N.D. Ill. Jan. 25, 2021) (similarly finding parents' allegations insufficient to establish an injury-in-fact where parents alleged that they paid their children's tuition and fees but did not enter into a contract with the defendant nor allege that they were the third-party beneficiary of any such contract, and citing, *inter alia*, *Bergeron v. Rochester Inst. of Tech.*, No. 20-CV-6283 (CJS), 2020 WL 7486682, at *3 (W.D.N.Y. Dec. 18, 2020), and *Lindner v. Occidental Coll.*, No. CV 20-8481-JFW (RAOx), 2020 WL 7350212, at *5 (C.D. Cal. Dec. 11, 2020), for the same proposition).

Quinnipiac also cites other decisions outside of this specific context that likewise recognize that a parent lacks standing to sue an educational institution for an alleged injury to his or her child. *See, e.g.*, *Doe v. Univ. of the S.*, 687 F. Supp. 2d 744, 761 (E.D. Tenn. 2009) (holding, in suit arising from student's withdrawal from university following Title IX proceeding, that parents lacked standing to sue university in contract or quasi-contract based on their payment of tuition on behalf of their son, as "[i]t is fairly evident that the 'payment of tuition does not create a contractual relationship between parents and a college' when the parents' child is over the age of majority")

(quoting *Apffel v. Huddleston*, 50 F. Supp. 2d 1129, 1133 (D. Utah 1999)); *McCormick v. Dresdale*, No. CIV.A. 09-474 S, 2010 WL 1740853, at *2 (D.R.I. Apr. 28, 2010) (dismissing parents' breach of contract claims against Brown University in suit involving student's withdrawal from university following sexual assault accusation, as "the parents were not third party beneficiaries to any contract between William, who turned eighteen . . . and Brown") (citing *Doe v. Univ. of the S.*, 687 F. Supp. 2d 744).

Plaintiffs do not cite any contrary authority and instead argue that these cases are inapplicable and/or rely upon flawed reasoning because they do not consider the distinct contractual nature of the Parent Plaintiffs' claims, or the fact that the Parent Plaintiffs have suffered an injury-in-fact in the form of the loss of the payments that they remitted to Quinnipiac. They further argue that given these allegations of a cognizable injury, the issue is not one of Article III standing but, rather, "contractual standing," citing *SM Kids, LLC v. Google LLC*, 963 F.3d 206 (2d Cir. 2020). There, the Second Circuit held that the district court's conclusion that the plaintiff lacked standing to enforce a settlement agreement arising from a trademark infringement litigation, which only the holder of the trademark could enforce, erroneously conflated contractual standing with constitutional standing. *See id*. at 211. "Contractual standing," the Court of Appeals indicated, "is distinct from Article III standing and does not implicate subject-matter jurisdiction. . . . Although the question of whether Google breached a contract with SM Kids depends on whether SM Kids enjoyed a contractual relationship with Google, the existence of such a relationship is not a prerequisite to a court's power to adjudicate a breach-of-contract claim." *Id*. Therefore, the Second Circuit explained, while the fact that the plaintiff may not have held a valid assignment of the trademark would defeat its success on the merits, that issue did not have any bearing on the plaintiff's ability to establish an injury-in-fact, which was demonstrated by its

allegation that it suffered economic losses as a result of the defendant's alleged violation of the settlement agreement.  *See id*. at 211–12.

The Court would agree with Plaintiffs that *SM Kids* might compel the conclusion that the issue here is one of contractual rather than constitutional standing ***if*** the Parent Plaintiffs had alleged an injury arising from a breach of the contract specified in the Amended Complaint. However, the Plaintiffs have not plausibly alleged any contract between Quinnipiac and the Parent Plaintiffs. The Plaintiffs only plausibly plead a contract between Quinnipiac and its students, which, as discussed above, does not confer any rights upon the Parent Plaintiffs.  Accordingly, *SM Kids* is inapposite.  While the FAC obfuscates any purported distinction between the contractual obligation allegedly owed to the students and that owed to the parents, it is readily apparent from the face of the Amended Complaint, as confirmed by counsel at oral argument, that the Parent Plaintiffs are *not* alleging that Quinnipiac had a contractual obligation to provide the Parent Plaintiffs themselves in-person educational services, or any other services for that matter.  (*Cf., e.g*., FAC ¶ 14 (alleging that "Plaintiffs paid Defendant for opportunities and services they or their children did not receive, including on-campus education, facilities, services, and activities"); *id.* ¶ 44 (alleging that "Defendant became contractually obligated to provide on-campus classes to Plaintiffs and Class Members").)  Thus, to the extent that the Parent Plaintiffs believe that they have suffered a financial loss by paying for in-person instead of online classes, such loss does not derive from any alleged contract with Quinnipiac but, rather, from a private arrangement between the Parent Plaintiffs and their children.  *See Salerno v. Fla. S. Coll*., 488 F. Supp. 3d 1211, 2020 WL 5583522, at *4 (M.D. Fla. 2020) (observing that mother seeking reimbursement of tuition paid for Spring 2020 semester on behalf of her daughter did not "adequately explain how any action on Florida So[u]thern College's part injured her," and concluding that "the lack of injury to [the

mother] is clear regardless of whether [the mother] provided financial support to her daughter" as "[t]hat arrangement was between mother and daughter" and "does not establish a relationship between the College and [the mother]").  In other words, it is the student and not the parent that has suffered the alleged injury-in-fact that is traceable to the alleged actions of Quinnipiac for purposes of Article III.  *See also Gociman*, 2021 WL 243573, at *2 ("Once a student reaches the age of majority, courts have routinely held that parents lack standing to bring claims against their adult children's colleges and universities, even when the parents pay tuition on behalf of their children") (quoting *Lindner*, 2020 WL 7350212, at *5).[1]

For similar reasons, the Parent Plaintiffs lack standing to bring an unjust enrichment claim against Quinnipiac, as the theory of unjust enrichment is one of a contract implied in law—where "justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract." *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573, 898 A.2d 178 (2006) (citation omitted); *see also Doe v. Univ. of the S.*, 687 F. Supp. 2d at 762 (concluding that student's parents "have failed to plead facts or cite law which establish they have standing to pursue a contract implied in law or unjust enrichment claim against the University").

The Court therefore dismisses the Parent-Plaintiffs' claims as to Count One, Two, and Three for lack of standing.

---

[1] The Court also rejects the reasoning of *Uddin v. New York Univ.*, 47 Misc. 3d 38, 6 N.Y.S.3d 900 (1st Dep't 2014), cited by the Plaintiffs, in which the Appellate Division of the New York Supreme Court held that a father had stated a viable breach of contract claim against New York University in a suit seeking reimbursement for tuition made by the plaintiff on behalf of his son.  In so holding however the court did not consider the issue of standing, and the overwhelming federal caselaw cited by Quinnipiac demonstrates that the vast majority of courts that have addressed the issue have found that a parent lacks standing to enforce a contract between his or her child and the university that the child is attending.  Nor does the Court agree with Plaintiffs that the fact that students must report their parents' income in order to obtain federal student aid imposes a "requirement" on the Plaintiff Parents, or on any parent, to pay his or her child's tuition that becomes enforceable via a breach of contract action.

**Whether the Educational Malpractice Doctrine Bars the Plaintiffs' Claims**

In the motion to dismiss, Quinnipiac principally argues that all of the Plaintiffs' claims are barred by the educational malpractice doctrine. Under this doctrine, "courts have almost universally held that claims of 'educational malpractice' are not cognizable." *Gupta v. New Britain Gen. Hosp.*, 239 Conn. 574, 591, 687 A.2d 111 (1996) (footnote omitted). The doctrine applies "[w]here the essence of the complaint is that an educational institution breached its agreement by failing to provide an effective education, [and] the court is asked to evaluate the course of instruction and called upon to review the soundness of the method of teaching that has been adopted by that educational institution." *Id.* at 590 (quoting *Ross v. Creighton University*, 957 F.2d 410, 416 (7th Cir. 1992)) (alterations and ellipsis omitted). "Among other problems for adjudication, these claims involve the judiciary in the awkward tasks of defining what constitutes a reasonable educational program and of deciding whether that standard has been breached." *Id.* at 591. However the Connecticut Supreme Court has recognized two exceptions to this prohibition. The first, which is not alleged here, "would be exemplified by a showing that the educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field." *Id.* at 592. "The second would arise if the educational institution failed to fulfil[l] a specific contractual promise distinct from any overall obligation to offer a reasonable program." *Id.* at 593.[2]

Quinnipiac argues that all of Plaintiffs' claims "hinge on the allegation that the Plaintiffs received an education that was worth less than what they paid because of the transition to online learning," and are accordingly precluded by the doctrine. (Def.'s Mem. at 2.) Quinnipiac further observes that "[w]hen the gravamen of the complaint is that the institution failed to provide an

---

[2] The doctrine also does not prohibit claims alleging that the institution "act[ed] arbitrarily, capriciously, or in bad faith," *id.* at 595, although the FAC does not invoke this exception.

effective or quality education, all of the claims asserted in the complaint are to be construed as educational malpractice claims, no matter what labels or conclusions are used in pleading those claims." (*Id*. at 12.)   *See, e.g.*, *Jacobs v. Ethel Walker Sch. Inc.*, No. CV020515279S, 2003 WL 22390051, at *4 (Conn. Super. Ct. Sept. 30, 2003) ("[A] plaintiff does not have to use the words 'educational malpractice' in order for a cause of action to sound in the tort of educational malpractice") (citing *Vogel v. Maimonides Academy of Western Conn., Inc*., 58 Conn. App. 624, 631, 754 A.2d 824 (App. Ct. 2000)).   Citing the complaint's references to "vastly different" or "less valuable" online classes (FAC ¶¶ 66, 102, 112), Quinnipiac argues that Plaintiffs' claims will require a factfinder to determine whether the remote teaching and services that Plaintiffs received had substantively less educational value than their in-person counterparts.

In response, Plaintiffs assert that they are not contesting the manner with which Quinnipiac and its faculty implemented online teaching instruction or asserting that classes should have been taught differently.  Instead, Plaintiffs maintain that they challenge Quinnipiac's decision to retain tuition and fees for educational services that the institution allegedly promised but never provided. As such, Plaintiffs characterize their claims as commercial as opposed to academic and submit that this case does not implicate the concerns expressed in *Gupta* regarding improper judicial forays into evaluations of the quality or value of academic instruction, issues on which educational institutions are normally afforded deference.  Rather, Plaintiffs argue that this case falls squarely into the second exception recognized in *Gupta* for claims arising out of an alleged failure to fulfill a specific contractual promise.

On the issue—whether this type of tuition reimbursement suit implicates the educational malpractice doctrine—courts around the country are somewhat divided.  The Defendant cites the Court to *Paynter v. New York Univ.*, 66 Misc. 2d 92, 319 N.Y.S.2d 893 (1st Dep't 1971), a brief

*per curiam* opinion in which the Appellate Division of the New York Supreme Court reversed an award of a tuition refund to the parent of a son whose classes were suspended at NYU from May 7, 1970 through the remainder of the school year prior to final examinations due to anti-war demonstrations on campus. The court there noted that "while in a strict sense, a student contracts with a college or university for a number of courses to be given during the academic year, the services rendered by the university cannot be measured by the time spent in a classroom," while also citing the general principle that disfavors judicial intervention into matters of educational governance. *Id.* at 894. However, one district court aptly distinguished *Paynter* from the situation here by observing "that there is a world of difference between canceling some classes—in the absence of any affirmative guarantee on the number of classes to be held—and not affording students services and benefits for an extended period of time despite … a promise [to do so]," as during half of the entire Spring 2020 semester. *Ford v. Rensselaer Polytechnic Inst.*, No. 1:20-CV-470, 2020 WL 7389155, at *5 (N.D.N.Y. Dec. 16, 2020); *see also In re Columbia Tuition Refund Action*, Nos. 20-CV-3208 (JMF), 20-CV-3210 (JMF), 2021 WL 790638, at *6 (S.D.N.Y. Feb. 26, 2021) (distinguishing *Paynter* in light of the opinion's emphasis on an "insubstantial change made in the schedule of classes" as precluding the plaintiff's recovery, as "the Court cannot conclude as a matter of law that Pace[ University's] adoption of online instruction from mid-March through the end of the spring semester was an 'insubstantial change'") (quoting *Paynter*, 319 N.Y.S.2d at 894).

In its Notices of Supplemental Authority, Quinnipiac also cites to two recent decisions construing this issue in its favor in the context of the COVID-19 pandemic. In *Gociman*, 2021 WL 243573, at *1, the plaintiffs brought a putative class action on behalf of individuals who had paid tuition or fees for in-person instruction at Loyola University of Chicago during the Spring

14

2020 semester, "seek[ing] damages representing the difference in value between in-person classes and access to facilities, and the online education they received."  The district court found that "the theory underlying all of plaintiffs' claims is that the education plaintiffs received once defendant transitioned to remote instruction in response to the COVID-19 pandemic was 'worth significantly less than the value of live classes.'"  *Id*. at *3.  Thus the court found that "resolution of Plaintiffs' claims would require the Court to make judgments about the quality and value of the education defendant provided in the Spring 2020 semester."  *Id*. (quoting *Linder*, 2020 WL 7350212, at *7). In so holding the court rejected plaintiffs' argument that they were "not challenging the quality of their education, but rather alleging that defendant failed to perform the educational service 'at all'"—an argument which the court found belied by the FAC's "repeated[] claims that the online instruction was 'worth less' than the traditional in-person instruction."  *Id*.  Likewise, in *Linder*, cited therein, the district court reached the same conclusion.  *See* 2020 WL 7350212, at *7 (finding that resolution of plaintiffs' claims that defendant's remote instruction "was not 'worth the amount charged' or 'in any way the equivalent of an in-person education[,]'" that its "Spring 2020 programs were 'sub-par' and that online classes lacked 'collaborative learning and dialogue, feedback, and critique[,]' . . . would require the Court to make judgments about the quality and value of the education that [the defendant] provided" and were therefore barred by the educational malpractice doctrine) (alterations omitted).

Plaintiffs cite the Court to other cases that have reached the opposite conclusion.  For example, in *Salerno*, 2020 WL 5583522, at *4–5, the district court found that the plaintiff's allegations "that the College's publications clearly implied that courses would be conducted in-person" and that its "materials also touted its many resources and facilities—all of which were located on the campus thereby implying in-person participation" were sufficient to state a claim

based upon the breach of an "implied-in-fact contract" under Florida law. The court further concluded that "this case is not about the quality of the College's education" so as to implicate the educational malpractice doctrine, but, rather, "is simply about an alleged promise to provide in-person learning that was allegedly breached." *Id*. at *5. Several other recent decisions have reached similar conclusions. *See, e.g.*, *McCarthy v. Loyola Marymount Univ.*, No. 2:20-CV-04668-SB (JEMx), 2021 WL 268242, at *3 (C.D. Cal. Jan. 8, 2021) (observing that "[t]he question here is whether Defendant made a specific promise to provide in-person instruction for the duration of Plaintiff's semester" and concluding that "the purported promise in this case does not involve an academic decision outside the realm of judicial determination," as "the decision to suddenly shift to online education can hardly be characterized as an 'academic decision' within the meaning of that doctrine. Indeed, the decision to cease in-person instruction involved no judgment, much less an academic one, because Defendant was mandated by government orders to do so."); *Hiatt v. Brigham Young Univ.*, No. 1:20-CV-00100 (TS), 2021 WL 66298, at *3 (D. Utah Jan. 7, 2021) ("Plaintiff is not asking the Court to interfere in BYU's academic or pedagogical choices by requiring BYU to provide in-person education or change its methods of education. Rather, Plaintiff is asking for a refund of tuition and/or mandatory fees for the breach of contract alleged. The requested relief does not require the Court to ask BYU to change its operations or otherwise interfere in BYU's academic decisions, so this argument does not support granting the Motion."); *Saroya v. Univ. of the Pac.*, No. 5:20-CV-03196 (EJD), 2020 WL 7013598, at *4 (N.D. Cal. Nov. 27, 2020) ("[C]onstruing the FAC in the light most favorable to Plaintiff, his claim is not that UOP failed to provide students with an adequate education, but that it failed to provide certain services as promised. Notwithstanding Plaintiff's allegations comparing remote learning to in-person learning, ruling on these issues would not require an inquiry into pedagogical methods, the quality

of Defendant's instructors and curriculum, or an evaluation of Plaintiff's progress or achievement, or the reasons for their success or failure") (quotation marks, alterations, and citation omitted); *Chong v. Ne. Univ.*, No. CV 20-10844 (RGS), 2020 WL 7338499, at *2 n.1 (D. Mass. Dec. 14, 2020) ("The court is not convinced that plaintiffs' contract claim is merely a disguised educational malpractice claim, as Northeastern implies. The TAC appears to challenge the mere fact of the switch from in-person to online instruction, not the *quality* of the online education Northeastern provided") (citing *Salerno*, 2020 WL 5583522, at *5); *Gibson v. Lynn Univ., Inc.*, No. 20-CIV-81173 (RAR), 2020 WL 7024463, at *4 (S.D. Fla. Nov. 29, 2020) ("The Court emphasizes that this is not a case about the quality of the education Lynn provided students during the Spring 2020 semester. Lynn is correct that Florida does not recognize a cause of action for educational malpractice.  Rather, Plaintiff's claim is based on Lynn's alleged failure to provide in-person, on-campus instruction and access to campus facilities and resources.") (internal citation omitted).[3]

Having considered the divergent views on this issue, the Court agrees with the majority of cases that have deemed the educational malpractice doctrine inapposite to the theory of liability alleged here.  The Court further agrees with the district court in *Hassan v. Fordham Univ.*, No. 20-CV-3265 (KMW), 2021 WL 293255 (S.D.N.Y. Jan. 28, 2021), another tuition reimbursement suit brought in the face of the pandemic, that because the Plaintiffs' allegations concerning the lesser

---

[3] Plaintiffs also cite to a number of recent state court decisions that are in accord.  *See, e.g.*, *Spiegel v. Trustees of Indiana University*, No. 53C06-2005-CT-000771, 2020 WL 7135320, at *2 (Ind. Cir. Ct. Nov. 19, 2020) ("The essence of Plaintiff's claims is that he contracted for in-person classes and certain services, which he never received and for which he paid a premium. This does not challenge the quality of the education, but the actual product and service delivered. Indeed, it would make no difference if what Plaintiff received were actually or a higher value, just that he did not receive that for which he contracted and pre-paid valuable consideration in the form of tuition and fees. Accordingly, making all inferences in Plaintiff's favor, the Court finds that Plaintiff's claims are not for educational malpractice."); *Smith v. Ohio State University*, No. 2020-00321JD, 2020 WL 5694224, at *2 (Ohio Ct. Cl. Sep. 09, 2020) (holding that where "[t]he essence of plaintiff's breach of contract claim is that she contracted for in-person classes and received online classes instead," the claim was not barred by the educational malpractice doctrine). Quinnipiac challenges Plaintiffs' reliance on many of these state court decisions due to their failure to apply the more rigorous federal pleading standards.  The Court need not rely on any state court decisions outside of Connecticut in resolving the instant motion.

value of the online instruction that they received "primarily would impact the *damages* element of Plaintiff[s'] contract claim, the Court is not persuaded that they form the 'essence' of the Complaint, such that Plaintiff's claims should be barred entirely at this stage." *Id*. at *4 (emphasis added); *accord Gupta*, 239 Conn. at 590 (noting that the doctrine applies "[w]here the essence of the complaint is that an educational institution breached its agreement by failing to provide an effective education") (quoting *Ross*, 957 F.2d at 416); *see also Oyoque v. Depaul Univ*., No. 20 C 3431, 2021 WL 679231, at *2 (N.D. Ill. Feb. 21, 2021) ("Though portions of the plaintiffs' allegations *can* be read as talking about the value of online instruction, at its core the complaint's focus is breach of contract—whether DePaul [University] provided the specific services it allegedly promised. To the extent the plaintiffs discuss the difference in value between in-person and online education, that discussion is limited to alleging damages from the defendant's alleged breach of contract, not an allegation that any decreased value *constitutes* the breach of contract"). Indeed, the Connecticut Supreme Court has elsewhere emphasized that the distinction between legally cognizable negligence cases and impermissible educational malpractice cases "lies in the duty that is alleged to have been breached." *Doe v. Yale Univ.*, 252 Conn. 641, 659, 748 A.2d 834 (2000). "If the duty alleged to have been breached is the duty to educate effectively, the claim is not cognizable." *Id*. Although decided in the context of the common law of negligence, the Court finds it instructive that the standard articulated by the Connecticut Supreme Court does not focus on the nature of damages as the *sine qua non* to ascertaining whether a suit is fundamentally one of educational malpractice. Rather, at least implicitly, it looks to the theory of liability alleged, which here, is a breach of contract.

Here, as discussed in many of the cases cited above, the promise alleged to have been breached is not a promise to provide an effective or adequate education but instead to provide an

in-person education.  The Court therefore disagrees with the Defendant that the fact finder would necessarily be called upon to assess such questions as whether a lecture delivered by Zoom is less valuable than one offered in person, whether students' virtual interactions with faculty members are less educationally meaningful than in-person interactions, or whether remote library and other related services failed to provide an appropriate level of support following the closure of on-campus facilities.  (Def.'s Mem. at 16.)   Because it appears plausible from the face of the complaint that Plaintiffs' claims may be capable of resolution without inviting such subjective assessments of educational quality, and because Plaintiffs have pled the breach of a specific contractual promise, as discussed, *infra*, the educational malpractice doctrine does not bar their claims at this stage.  The Court reaches the same conclusion with respect to Plaintiffs' unjust enrichment claims, which are based on an implied in law theory of contract liability.

However, if in the future it becomes manifest that resolving Plaintiffs' claims or assessing their damages will ultimately "entail[] evaluation of whether a course conducted remotely was less valuable than one conducted in person—and if so, by how much—the Court [will reassess whether it] should decline to enter the classroom and determine whether or not the judgments and conduct of professional educators were deficient."  *Hassan*, 2021 WL 293255, at *4 (quotation marks and citation omitted).

### Whether Plaintiffs Have Adequately Pled the Breach of a Specific Promise

"The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages."  *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291, 87 A.3d 534 (2014). Connecticut law recognizes that "'[t]he basic legal relation between a student and a private university or college is contractual in nature' and 'there seems to be no dissent from the proposition

that the catalogues, bulletins, circulars, and regulations of the institution determine the contractual relationship between the student and the educational institution.'" *Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 667 (D. Conn. 2019) (quoting *Burns v. Quinnipiac Univ.*, 120 Conn. App. 311, 320–21, 991 A.2d 666 (App. Ct. 2010)). "Because a student bases his or her decision to attend a college or university, in significant part, on the documents received concerning core matters, such as faculty, curriculum, requirements, costs, facilities and special programs, application of contract principles based on these documents and other express or implied promises, consistent with the limitations expressed in *Gupta* . . . appears sound." *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 93 (D. Conn. 2000).

Here, Plaintiffs allege the breach of either an express contract or, in the alternative, an implied contract, which the Court construes as an implied in fact contract. "An implied in fact contract is the same as an express contract, except that assent is not expressed in words, but is implied from the conduct of the parties." *Vertex, Inc.*, 278 Conn. at 573–74.

> [A] true implied in fact contract can only exist . . . where there is no express one. It is one which is inferred from the conduct of the parties though not expressed in words. Such a contract arises where a plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefor, and the defendant, knowing such circumstances, avails himself of the benefit of those services. In such a case, the law implies from the circumstances, a promise by the defendant to pay the plaintiff what those services are reasonably worth.

*Janusauskas v. Fichman*, 264 Conn. 796, 804–05, 826 A.2d 1066 (2003) (quotation marks and citations omitted).[4]

Quinnipiac principally disputes Plaintiffs' ability to establish the first element of a breach of contract claim—*i.e.*, the formation of an agreement to provide on-campus instruction. It asserts

---

[4] As noted *supra*, an implied in law contract, on the other hand, "may arise due to one party being unjustly enriched to the detriment of the other party." *Vertex, Inc.*, 278 Conn. at 574. The Court addresses Plaintiffs' implied in law contract, or unjust enrichment claim, in the context of Count Three below.

that "the promise on which a plaintiff relied must have been precise and based on specific contractual terms or provisions" in order to plead a viable breach of contract claim consistent with the second *Gupta* exception.  (Def.'s Mem. at 20 (quoting *Kloth-Zanard v. Amridge Univ.*, No. 3:09-CV-606 (JBA), 2012 WL 2397161, at *4 (D. Conn. June 25, 2012).)  Quinnipiac further argues that "general, vague, or aspirational language" such as that evidenced in the Bulletin is insufficient to meet *Gupta's* standard.  (*Id.*)  *See Faigel v. Fairfield Univ.*, 75 Conn. App. 37, 41–42, 815 A.2d 140 (App. Ct. 2003) (holding that defendant's alleged oral promise that plaintiff "would receive 'many credits'" for her prior engineering studies in Russia did not qualify as a "specific contractual promise" under *Gupta*); *see also, e.g.*, *McNeil v. Yale Univ.*, 436 F. Supp. 3d 489, 532–33 (D. Conn. 2020) (holding that "[t]he general language relied on by Plaintiffs from Yale's Equal Opportunity Statement, Undergraduate Regulations and Sexual Misconduct Policies" did not create enforceable promise to provide educational programs and student organizations free of sex discrimination and sexual misconduct, as these promises were insufficiently specific and also implicated the educational malpractice doctrine by requiring the court to assess the reasonableness of Yale's efforts at eliminating sexual misconduct and discrimination); *Kloth-Zanard*, 2012 WL 2397161, at *4 (holding, in breach of contract action premised on institution's alleged failure to fulfill its obligations to assist the plaintiff in securing a clinical training program, that representative's statements that the university "would 'assist' students 'in making sure you get that part of your training done,' . . . does not amount to a 'specific promise' as to the extent or nature of assistance that would be provided" and reaching same conclusion with respect to the plaintiff's allegation that a faculty member told her "that he would help students 'in any way' he could . . . to procure a clinical site placement"); *accord Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 709 (D. Vt. 2012), *aff'd*, 570 F. App'x 66 (2d Cir. 2014) ("Language in a college handbook

or other official statement that is merely aspirational in nature, or that articulates a general statement of a school's 'ideals,' 'goals,' or 'mission,' is not enforceable") (applying Vermont law).[5]

Here, however, Plaintiffs have alleged more than mere "aspirational" language illustrated in the Bulletin and Quinnipiac's website—which tout such features as "state-of-the-art facilities," "outdoor spaces," "classroom and immersive experiential learning," and "the beauty of New England." (*E.g.*, FAC ¶¶ 28, 30, 31, 37.)  Plaintiffs further allege that Quinnipiac charges students significantly less for online degree programs—between $515 and $575 per credit for undergraduate online degree programs, as compared to between $1,517.50 and $2,023.33 per credit for on-campus students taking between 12 and 16 credit hours.  (*Id*. ¶¶ 45, 48).  Such allegations in combination with the parties' alleged course of conduct allow the reasonable inference that the parties may have at least implicitly entered into a specific agreement for on-campus instruction by virtue of the Plaintiffs having been charged under, and paid, the higher of

---

[5] In addition, Quinnipiac cites *Chong v. Ne. Univ.*, No. CV 20-10844 (RGS), 2020 WL 5847626 (D. Mass. Oct. 1, 2020), in which the district court dismissed, *inter alia*, a breach of contract claim premised on Northeastern University's alleged failure to reimburse students for tuition remitted during the pandemic.  The district court agreed with the defendant that plaintiffs failed to state a claim for breach of an annual Financial Responsibility Agreement ("FRA"), which "ties the payment of tuition to registration for courses, not to the receipt of any particular method of course instruction."  *Id*. at *3.  The court further noted that plaintiffs did "not plead that the course descriptions provided by the Northeastern Registrar comprised part of the parties' contract" and their complaint also "lacks any allegation which might allow the court to reasonably infer that these descriptions were meant to be read 'in conjunction with' the FRA."  *Id.*  Notably, the court dismissed the plaintiffs' tuition reimbursement claims without prejudice and permitted the claims to proceed following the filing of the plaintiffs' third amended complaint.  *See Chong*, 2020 WL 7338499, at *3 (denying subsequent motion to dismiss, as "[d]rawing all inferences in plaintiffs' favor, the court cannot, as a matter of law, say that no student who read these statements could have reasonably expected that executing the FRA and registering for on campus courses would entitle them to in-person instruction").

Quinnipiac also cites *Squeri v. Mount Ida Coll.*, 954 F.3d 56 (1st Cir. 2020), a case in which the First Circuit affirmed dismissal of a breach of contract claim, among others, brought against Mount Ida College after it permanently closed upon providing only six weeks' notice to its students.  "Underlying all the claims were allegations that the defendants knew that Mount Ida was on the brink of insolvency but concealed this information, instead assuring current and prospective students that Mount Ida was financially stable."  *Id*. at 61.  The First Circuit held that the contract claim failed for lack of specificity, as the plaintiffs did "not plausibly allege a breach of implied contract, let alone an express contract, that the college contracted to give earlier notice than it did or that there was a contract for four years of education in exchange for only one semester of tuition."  *Id*. at 71–72.  Unlike here, the plaintiffs did "not allege the terms of any such contract," *id*. at 71, and the Court otherwise finds the case inapposite.

these two tuition schemes while attending in-person classes during the first half of the Spring 2020 semester.[6] *See Rosado v. Barry Univ. Inc.*, No. 1:20-CV-21813 (JEM), 2020 WL 6438684, at *3 (S.D. Fla. Oct. 30, 2020) (concluding that the plaintiff's "allegations that Barry [University] accepted $773 more per credit for in-person classes from [the plaintiff], and actually provided in-person education to [the plaintiff] until March 19, 2020, in the backdrop of numerous other documents referring to in-person classes and amenities, are sufficient to establish, at minimum, an implied contract") (applying Florida law); *see also Bergeron*, 2020 WL 7486682, at *7–8 (finding plaintiffs' allegations of the defendant's promise to provide in-person instruction sufficiently specific to withstand motion to dismiss where they "allege a number promises made by [the defendant] with respect to the benefits of enrollment in the more expensive in-person, on-campus program, including: the opportunity to work directly with faculty members in their labs, multi-faceted experiential learning, vibrant campus life, 'access to the finest laboratories, technology, and computing facilities available on any campus', and 'a strong and robust network of support on campus to help you succeed,'" as "[t]hese allegations clearly extend beyond coursework to the entirety of the educational experience.") (internal citations omitted) (applying New York law); *Espejo*, 2021 WL 810159, at *5 (expressing doubt "that the vast majority of Plaintiffs' allegations," which relied on Cornell University's marketing, course registration, and related materials, "give rise to a contractual agreement for in-person instruction," but permitting case to proceed past motion to dismiss based principally on allegation that Cornell defined "'experiences in the classroom and 'on campus'" as part of its mission statement, which the court construed as "an explicit statement from the university indicating that the education for which Plaintiffs paid

---

[6] Whether the allegations sufficiently plead the existence of an express contract is a closer call but the Court finds that the issue of whether and to what extent the parties may have entered into an express or an implied contract for the provision of in-person educational services will be better resolved following discovery.

includes an on-campus component") (applying New York law); *but see Gociman*, 2021 WL 243573, at *4 (rejecting plaintiffs' argument "that in-person instruction was implied by the difference in tuition for the 'in-person' and 'online-program,'" as "[a] difference in tuition is insufficient to allege a specific contractual promise" under Illinois law).

In addition, although it is true, as Quinnipiac points out, that the Bulletin distinguishes between "undergraduate and graduate classes' and "online classes" as opposed to "on-campus" and "online classes," the Bulletin's Academic Calendar does provide different dates for when "Undergraduate and graduate on-campus classes end" and "Online classes end." (S*ee* FAC Ex. C at 14–16 of 749.)  And even where the Academic Calendar refers simply to "Undergraduate and graduate classes" without the "on-campus" qualification, the very fact of distinguishing between undergraduate/graduate classes and "online classes" can plausibly read as suggesting that the former are held on-site.  While discovery may ultimately defeat Plaintiffs' ability to demonstrate the existence of an express or implied contract based on the Bulletin and other course materials, the Court deems Plaintiffs' allegations sufficient at this stage to allow the inference of a specific promise to provide in-person instruction, and will accordingly deny the motion to dismiss the breach of contract claims.[7]

**Unjust Enrichment**

"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another."  *Town of New Hartford v. Connecticut*

---

[7] Quinnipiac also notes that it "reserved the right to change any provision of the Bulletin at any time."  (Def.'s Mem. at 26 (quoting Bulletin at 3 of 749) (alterations omitted).)  It further notes that the Bulletin does not include any provision allowing for a refund of tuition or fees under the circumstances alleged.  However the Court deems such questions as to whether the specific terms of the alleged contract permit or preclude Plaintiffs' recovery improper for resolution without further factual development.

*Res. Recovery Auth.*, 291 Conn. 433, 451, 970 A.2d 592 (2009) (quotation marks and citation omitted).  "Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment."  *Id*. at 451–52 (quotation marks and citation omitted).

Quinnipiac argues that Plaintiffs cannot maintain an unjust enrichment claim when they have pled the existence of an enforceable contract.  However, the Federal Rules of Civil Procedure specifically contemplate and permit a plaintiff to plead in the alternative.  *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *see also, e.g.*, *NovaFund Advisors, LLC v. Capitala Grp., LLC*, No. 3:18-CV-1023 (MPS), 2019 WL 1173019, at *15 (D. Conn. Mar. 13, 2019) ("[B]ecause NovaFund's [unjust] enrichment claim is adequately pleaded in the alternative under Rule 8, and the existence of the contract is in genuine dispute, dismissal of this claim would be premature").[8]  Therefore, in light of the parties' dispute as to the existence of an enforceable contract, dismissal of the Plaintiffs' unjust enrichment claim is inappropriate at this juncture.

Quinnipiac also argues that Plaintiffs have failed to allege Quinnipiac's unjust retention of non-gratuitous benefits, citing *Roe v. Loyola Univ. New Orleans*, No. Civ. 07-1828, 2007 WL 4219174 (E.D. La. Nov. 26, 2007), a case that arose from the closure of Loyola University New Orleans in the aftermath of Hurricane Katrina.  Loyola College of Law, where the plaintiff was enrolled, arranged for its students to attend classes at other ABA-accredited law schools during

---

[8] Even if this issue is governed by substantive Connecticut law under the *Erie* doctrine, which the Court does not believe, pleading in the alternative is appropriate. *See Stein v. Horton*, 99 Conn. App. 477, 485, 914 A.2d 606 (App. Ct. 2007) ("Parties routinely plead alternative counts alleging breach of contract and unjust enrichment, although in doing so, they are entitled only to a single measure of damages arising out of these alternative claims. . . . Under this typical belt and suspenders approach, the equitable claim is brought in an alternative count to ensure that the plaintiff receives some recovery in the event that the contract claim fails.").

the fall 2005 semester and to receive full credit from those courses toward their Loyola degrees, provided the students paid their tuition to Loyola.  The plaintiff relocated to Dallas, where he attended SMU Law School during the fall of 2005 before returning to New Orleans to finish his degree at Loyola.  He later brought a tuition refund suit against Loyola in which he asserted, *inter alia*, an unjust enrichment claim.[9]  The district court granted summary judgment to the defendant on the unjust enrichment claim, first holding that the plaintiff failed to demonstrate "an impoverishment of the plaintiff" given that he received full credit for the SMU courses and graduated and sat for the bar exam on time.  *Id*. at *2–3.  The Court also noted that "the undisputed facts establish that there is 'no absence of justification or cause' for Loyola's retention of the tuition for the fall 2005 semester" given that Loyola took the actions it did to prevent its students from falling behind, and that if the plaintiff had enrolled at SMU directly he would have been obligated to pay SMU's higher tuition.  *Id*. at 3.

Plaintiffs distinguish *Roe* by pointing out that the plaintiff there was provided the option to attend another law school given Loyola's inability to operate after Hurricane Katrina, whereas Plaintiffs here were not afforded a choice—they were either required to attend classes online or forfeit an entire semester's worth of tuition.  And unlike the plaintiff in *Roe*, Plaintiffs are not seeking a "tuition-free" semester.  (Pl.'s Mem. at 23.)  Quinnipiac also relies on *Roe* for the proposition that Quinnipiac had no choice but to enact emergency measures in the face of the pandemic, noting that even if it had not decided to close it campus independently it would have been required to do so by Governor Lamont's executive orders.  However the question is not whether Quinnipiac was justified in moving its classes online, but whether it was unjust for it to

---

[9] To prevail on such a claim under Louisiana law, a plaintiff must prove five elements: "(1) there must be an enrichment of the defendant; (2) there must be an impoverishment of the plaintiff; (3) there must be a connection between the enrichment and resulting impoverishment; (4) there must be an absence of 'justification' or 'cause' for the enrichment or impoverishment; and (5) no other remedy available at law." *Id*. at *2.

retain tuition that it accrued with the expectation of delivering (allegedly higher cost) in-person instruction when it ultimately provided an (allegedly lesser-cost) online education for the latter half of the Spring 2020 semester.  In this way Plaintiffs have adequately alleged that Plaintiffs "paid Defendant non-gratuitous benefits for a comprehensive academic experience, including in-person classes, opportunities to network with students and professors in-person, access to campus buildings and dormitories, and to avail themselves of school programs and events."  (FAC ¶ 121.) It can be reasonably inferred from these allegations that Quinnipiac accrued excess funds by moving its courses online, and the question of whether the institution was unjustly enriched by retaining the Plaintiffs' tuition—which allegedly encompassed the costs of delivering in-person instruction and all of the attendant benefits that flow from it—is a question improper for resolution on a motion to dismiss.

**Conversion**

"Conversion is an unauthorized assumption and exercise of the right of ownership over property belonging to another, to the exclusion of the owner's rights." *Mystic Color Lab, Inc. v. Auctions Worldwide, LLC*, 284 Conn. 408, 418, 934 A.2d 227 (2007).  "To establish a prima facie case of conversion, the plaintiff[s] [must] demonstrate that (1) the material at issue belonged to the plaintiff[s], (2) that the defendant deprived the plaintiff[s] of that material for an indefinite period of time, (3) that the defendant's conduct was unauthorized and (4) that the defendant's conduct harmed the plaintiff[s]." *Coster v. DuQuette*, 119 Conn. App. 827, 832, 990 A.2d 362 (App. Ct. 2010) (quotation marks and citation omitted).  "[T]he party alleging conversion . . . must prove a sufficient property interest in the items in question." *Mystic Color Lab*, 284 Conn. at 419. "Accordingly, a claim for conversion may be brought when the relationship is one of bailor and bailee but not when it is one of debtor and creditor." *Id.*  "A bailment . . . contemplates redelivery

of goods entrusted to the bailee, whereas a debtor-creditor relationship contemplates the payment of an obligation defined by agreement between the parties." *Id*. at 420.  "Moreover, in order to establish a valid claim of conversion or statutory theft for money owed, a party must show ownership or the right to possess specific, identifiable money, rather than the right to the payment of money generally." *Id*. at 421.  Thus "[w]hen an action arises from a claim under an express or implied contract, a claim in tort is inappropriate." *Id*.

Quinnipiac argues convincingly that Plaintiffs' claim of entitlement to a tuition refund sounds in breach of contract and thus cannot be enforced via a conversion action. *Cf. Aztec Energy Partners, Inc. v. Sensor Switch, Inc.*, 531 F. Supp. 2d 226, 230 (D. Conn. 2007) ("Clearly, Aztec expected to receive a refund in exchange for returning the products and relinquishing title to them, but that is a claim sounding in breach of contract, not conversion").  As the bailee/bailor vs. debtor/creditor distinction recognized by the Connecticut Supreme Court illustrates, where the dispute arises from the defendant's failure to remit or refund payment pursuant to an agreement between the parties as opposed to the defendant's failure to return property held in trust for the plaintiff, the tort of conversion is inapposite.  For similar reasons Quinnipiac correctly emphasizes that Plaintiffs have not plausibly alleged that the purportedly wrongfully held tuition actually "belonged" to the Plaintiffs, once Plaintiffs relinquished it by paying for the semester.  When funds are intermingled with funds belonging to third parties, a bailment cannot exist, *see Mystic Color Labs*, 284 Conn. at 420—thus, once Quinnipiac deposited Plaintiffs' funds into its general account, they became "unidentifiable and untraceable," thereby defeating Plaintiffs' entitlement to any specific set of funds, *id*. at 427.  Plaintiffs also misapprehend the requirement that the funds be identified with "specificity" when they insist that they have adequately pled conversion by identifying the amount that Quinnipiac charged Plaintiffs for its tuition and fees.  The issue is not

28

whether the funds are "specific" in a quantifiable sense but whether they are traceable to Plaintiffs so as to sustain a specific property interest at the time that the funds were held by Quinnipiac. *See, e.g., Ford*, 2020 WL 7389155, at *9 (dismissing conversion claim in similar tuition reimbursement suit, as "plaintiffs have failed to allege that their tuition and fee payments still exist as a 'specific, identifiable fund' that defendant could have converted" and "cannot realistically argue that once that money was paid to defendant it remained intact, as opposed to pooling in with defendant's other funding") (applying New York law).

In short, Plaintiffs may not rely on the same allegations that give rise to their contract claims to bring a claim for conversion.

**Conclusion**

For the foregoing reasons, the Parent Plaintiffs are dismissed from this suit and the Defendant's motion to dismiss is granted as to the conversion claim.  The motion is denied in all other respects.

**SO ORDERED** at Bridgeport, Connecticut, this 25th day of March 2021.

/s/ Kari A. Dooley
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE